**Ronnie T. DAVIS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–120.

District of Columbia Court of Appeals.

Argued April 25, 1989.
Decided Nov. 28, 1989.

Walter S. Booth, Bethesda, Md., appointed by this court, for appellant.

Craig S. Iscoe, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, were on the brief, for appellee.

Before NEWMAN, TERRY, and STEADMAN, Associate Judges.

PER CURIAM:

Judge Learned Hand once wrote, "Prosecution and judgment are two quite separate functions; they must not merge." *United States v. Marzano*, 149 F.2d 923, 926 (2d Cir.1945) (citations omitted). They merged in this case, to appellant's prejudice. We therefore must reverse his convictions of unauthorized use of a vehicle,[1] malicious destruction of property,[2] and assault on a police officer with a dangerous weapon.[3]

I

On the evening of June 11, 1986, Gail Weathers parked her 1985 black Toyota convertible in front of her apartment in Forestville, Maryland, just outside the District of Columbia. She locked the car doors

---

1. D.C.Code § 22–3815(b) (1989).

2. D.C.Code § 22–403 (1989).

3. D.C.Code § 22–505(b) (1989). The weapon in this case was the vehicle.

and raised the top of the convertible. When she looked outside the next morning, the car was gone. She immediately called the police and reported it stolen.

In the early morning hours of June 14, shortly before 1:00 a.m., Metropolitan Police Officer Gregory Wells was driving his scout car on Alabama Avenue, S.E., in the District of Columbia, when he saw a black Toyota convertible ahead of him occupied by four young men. The convertible top was down, and the two passengers in the rear were sitting on top of the seat while the car was in motion. Because this was a dangerous way to ride, Officer Wells decided to pull the car over and warn its occupants of the danger. Before doing so, however, Wells radioed the car's license number to the police dispatcher to check on the validity of its registration and to find out if it had been reported stolen. When the dispatcher radioed back that the car had indeed been reported stolen, Wells turned on his flashing red light and siren to signal the driver of the convertible—appellant—that he should pull over. Instead of stopping, however, appellant speeded up, and a chase ensued with both cars traveling at more than double the posted speed limit.

Officer William Hope was riding his motorcycle near the 3000 block of Alabama Avenue when he heard a report over his police radio of a high-speed chase in progress. Hope headed for the vicinity of the chase and fell in behind a scout car that was also responding to the call. When Hope first caught sight of the Toyota, it was headed directly toward that scout car (and Hope's motorcycle) at about forty to fifty miles per hour. When the scout car was unsuccessful in blocking the Toyota, Hope found himself directly in its path. Hope jumped off his motorcycle and ran for the curb, leaving the cycle in the middle of the street. As appellant hit the brakes to avoid running into the cycle, the Toyota skidded toward Hope.

Believing his life was in danger, Officer Hope pulled his service revolver and walked toward the Toyota, which by that time had almost come to a stop. Hope ordered appellant to shut off the engine and put the car in park. Having said that, Hope started walking over to the driver's side of the car, but as he approached, the car suddenly started up again. Hope tried to grab appellant, but appellant ducked, and Hope found himself clinging to the side of the car. He held on as long as he could, but when the car turned onto Alabama Avenue, Hope was thrown to the ground by centrifugal force. He suffered minor injuries. During the time Officer Hope was hanging onto the side of the car, he got a very good look at appellant, staring him practically in the eye. They were no more than two feet apart, and the street was well-lit. Hope's attention was focused on appellant because, he testified, "I was trying to grab hold of him to ... keep myself from falling off." Both at the scene of appellant's arrest and again in court, Officer Hope identified appellant as the driver of the black Toyota.

Although Officer Hope could not continue the pursuit, Officer Wells could and did, following the Toyota to the vicinity of Southern Avenue and Chesapeake Street, S.E., where it was abandoned after hitting a fence. The occupants of the car all fled on foot. The three passengers got away. Appellant, however, ran across Southern Avenue into Maryland, hotly pursued by Officer Wells, and was eventually apprehended by an off-duty Prince George's County police officer.[4] When Officer Wells went back to examine the Toyota, he discovered that the steering column had been punched, *i.e.*, the plastic ring around the turn signal had been broken so that the car could be started without an ignition key. In addition, the window on the driver's side was broken, and there were dents and scratches on the hood and the right side.

Appellant admitted being in the Toyota, but only as a rear-seat passenger, not as the driver. He testified that he was walk-

---

4. In that area Southern Avenue forms the border between the District of Columbia and Prince George's County, Maryland.

ing home alone after a basketball game when an acquaintance named Bernis (or Bernice), whom he knew from the basketball courts, drove up in a Toyota and asked him if he wanted a lift. Appellant hopped into the back seat between two other passengers, one of whom he knew only as "Little Man," and asked Bernis to take him to a 7–11 store. After they left the store, the four of them just rode around (Bernis driving) for want of anything better to do. When a police car came up behind them with its lights and siren on, Bernis "jumped" instead of stopping, increasing speed as the pursuit went on.

Appellant recalled seeing Officer Hope approach the car after Bernis slowed down to avoid hitting the motorcycle, but he said that Hope pointed a revolver at him from behind and reached over another back-seat passenger in an attempt to grab him (appellant) when the car took off. Appellant testified that he was the last one to get out of the car when it hit the fence and that he ran because he was scared. On direct examination appellant said that he turned himself in to the Prince George's County police officer, but on cross-examination he admitted that he was still running when the officer caught him. Appellant not only denied driving the Toyota at any time that evening; he testified that he did not drive at all and did not even possess a driver's license.

At the conclusion of the defense case, the court called counsel to the bench and suggested that one of them ask appellant if he ever drove a car, observing that "[i]f somebody establishes that he has a driver's license, the defense would look pretty flimsy." The court said it would not ask the question "because I don't know what he might say." The prosecutor declined to ask it, and defense counsel said she was satisfied that appellant did not drive; consequently, the question was not asked.

The prosecutor then called a Prince George's County police officer as a rebuttal witness, apparently to refute appellant's

testimony that he had surrendered to the police, rather than being apprehended while fleeing. It quickly became clear, however, that this officer had no direct knowledge of the arrest. As a result his entire testimony was stricken by the court, and the jury was instructed to disregard it. The trial then recessed for lunch.

The first order of business after the recess was a discussion about jury instructions. Then, before the jury was brought back into the courtroom, the court asked the prosecutor if she had any more rebuttal witnesses, and she replied that she did not. The court then said, "Something has come to my attention, which I want to take a short break and look into...." When the proceedings resumed, the court asked appellant if he ever went by the name Tyrone Lewis or Ronnie Tyrone Lewis. Appellant denied using either name. The court then asked appellant's mother, who was in the courtroom but unsworn, whether her son sometimes used the name of Lewis; she said that he did. Appellant thereupon admitted (not under oath) that he knew how to drive.

After these exchanges, the trial judge informed counsel that over the lunch hour he had asked his law clerk to have his (the judge's) secretary make a telephone call to find out whether appellant had a driver's license. As a result of this call, the judge learned that a person by the name of Ronnie Tyrone Lewis had a District of Columbia driver's license and that Lewis' address, social security number, and date of birth were identical to appellant's. Defense counsel said that appellant had told her he had lost his license, implying that he was telling the truth when he said he did not have one. Nevertheless, the judge said he was inclined to allow the prosecutor to recall appellant for additional cross-examination in order to "get this thing straightened out." Defense counsel immediately objected on the ground that the information about the driver's license had been gathered by the court,[5] and that the court was now allowing the government to re-

5. The prosecutor told the court that the only surname she had for appellant was Davis, so

that she "didn't have any other name to check."

open its case after saying that it had no further evidence to present.[6] The court, however, granted the government's motion to reopen its cross-examination of appellant, and the jurors were brought back into the courtroom.

On the reopened cross-examination and again on redirect, appellant admitted going by the name of Ronnie Tyrone Lewis, Lewis being his father's surname. He also admitted obtaining a driver's license under that name. He testified that he knew how to drive and that he had driven his uncle's car four or five times. He also said that he considered himself not to have a driver's license because he had lost his license.[7] Appellant then stepped down from the stand, and the trial proceeded to closing argument, instructions, and verdict.

A few days later appellant's counsel filed a motion for a new trial, arguing *inter alia* that appellant was prejudiced by the testimony about his driving and his once having possessed a driver's license, and that this prejudice was a direct result of the court's independent investigation into the question of whether appellant was a licensed driver. The trial court denied the motion. Appellant makes the same argument on appeal; we find it meritorious and reverse the judgment of conviction.

## II

Appellant argues that the trial judge went beyond his proper role of impartial magistrate when he initiated an investigation to find out whether appellant had ever had a driver's license. The government, on the other hand, maintains that the trial judge acted permissibly to prevent perjury. We agree with appellant.

A fair trial demands an impartial judge and an unbiased jury. *Rose v. Clark*, 478 U.S. 570, 577–578, 106 S.Ct. 3101, 3105–3106, 92 L.Ed.2d 460 (1986). When the "awful instruments of the criminal law" are brought to bear against a defendant by the state in the persons of the police and the prosecutor, an independent judiciary is a crucial safeguard—sometimes the only safeguard—in assuring that convictions will be obtained by the use of acceptable methods of criminal prosecution. *McNabb v. United States*, 318 U.S. 332, 343–344, 63 S.Ct. 608, 614–15, 87 L.Ed. 819 (1943). This is not to say that during a trial the judge should be merely a passive onlooker. At the very least, the judge should perform the traditional judicial functions of governing the course and conduct of the trial and adjudicating questions of law. *See Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933) (a judge is "not a mere moderator"); *United States v. Patterson*, 209 U.S.App.D.C. 249, 251, 652 F.2d 1046, 1048 (citing *Quercia*), *cert. denied*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981). In some circumstances a trial judge may play a more active role, but when that happens, he or she must at all times "remain a disinterested and objective participant in the proceeding.... Once [the judge's] neutral position has been jeopardized, the judicial evenhandedness that should pervade the courtroom disappears, and 'the right to a fair trial may be imperiled.'" *Haughton v. Byers*, 398 A.2d 18, 20–21 (D.C.1979) (citations omitted); *see United States v. Barbour*, 137 U.S.App.D.C. 116, 118, 420 F.2d 1319, 1321 (1969).

■ A trial judge, of course, has "not only the right but the duty ... to participate directly in the trial, including the propounding of questions when it becomes essential to the development of the facts of the case." *Womack v. United States*, 350 A.2d 381, 382–383 (D.C.1976) (citations omitted); *see Haughton v. Byers, supra*, 398 A.2d at 20. This power should be sparingly exercised, however, for it is primarily the task of counsel, not the court, to develop the facts essential to the jurors' understanding of the case. *See Greenhow v. United States*, 490 A.2d 1130, 1136 (D.C. 1985); *Shannon v. United States*, 311 A.2d

---

6. Defense counsel also objected on self-incrimination grounds, and on the ground that the issue of the driver's license was a collateral matter.

7. It is unclear from the record whether appellant meant that he had merely misplaced the license or that it had been suspended or revoked.

501 (D.C.1973); *Springs v. United States,* 311 A.2d 499, 500 (D.C.1973); *United States v. Wyatt,* 143 U.S.App.D.C. 136, 442 F.2d 858 (1971); *United States v. Barbour, supra,* 137 U.S.App.D.C. at 116–118, 420 F.2d at 1319–1321. Judicial intervention may also be permissible, and perhaps necessary, when the judge detects "a patent omission which might vitiate a full adjudication of the defendant's guilt or innocence." *Perry v. United States,* 364 A.2d 617, 620 n. 4 (D.C.1976). In the special context of contempt cases, the trial judge may to some extent assume the role of prosecutor and seek out evidence of prior contempt charges "because the offense is against the court itself rather than the sovereign." *In re Marshall,* 549 A.2d 311, 312–313 (D.C.1988). The judge's actions in the instant case do not fall within any of these categories of permissible conduct.

In *Kennedy v. Great Atlantic & Pacific Tea Co.,* 551 F.2d 593 (5th Cir.1977), the curiosity of the trial judge's law clerk got the better of him, and he personally visited the scene of the slip-and-fall accident that generated the suit, an A & P supermarket. The law clerk told the judge what he had done, and the judge instructed his clerk to contact counsel for the defendants to see if the clerk's investigation might prompt a settlement of the case. It did not. Moreover, the plaintiff's counsel later called the law clerk to testify about his observations at the supermarket. The judge allowed his clerk to testify over a defense objection. On appeal, the Fifth Circuit held that this was reversible error:

> [I]t was unacceptable that the most damaging evidence against the defendants in

this case was brought about by the intervention of a court official in the accumulation of evidence.... It was the [law clerk's] duty as much as that of the trial judge to avoid any contacts outside the record that might affect the outcome of the litigation.

*Id.* at 596. Citing Canon 3(A)(4) of the Code of Conduct for United States Judges, the court held that the law clerk's "private view of an accident in litigation" was a prohibited *ex parte* communication. *Id.* at 597.[8]

In *Price Brothers Co. v. Philadelphia Gear Corp.,* 629 F.2d 444 (6th Cir.1980), *after remand,* 649 F.2d 416, *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981), the trial judge, who was to preside over a bench trial where breach of warranty was at issue, allegedly sent his law clerk to the factory where the supposedly malfunctioning machine was located. Although the Sixth Circuit remanded the case with instructions to conduct an evidentiary hearing on whether the judge did in fact send his clerk on such a mission, the court was nonetheless quite emphatic in stating that, if the allegations were true, the judge acted improperly. "Unquestionably," the court said, "it would be impermissible for a trial judge to deliberately set about gathering facts outside the record of a bench trial over which he was to preside." *Id.* at 447. In so ruling, the court noted that Canon 3(A)(4) imposes a duty on trial judges "to avoid off-the-record contacts that might influence the outcome of the litigation." *Id.*[9]

■■■ Even though a judge may intervene, to a limited extent, in order to correct

**8.** The judges of the District of Columbia courts, both trial and appellate, are governed by the American Bar Association's Code of Judicial Conduct. *See Scott v. United States,* 559 A.2d 745, 748–749 n. 6, 756–757 (D.C.1989) (en banc). Canon 3(A)(4) of the ABA Code is, in all material respects, identical to Canon 3(A)(4) of the Code of Judicial Conduct for United States Judges, which states in pertinent part, "A judge should ... neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding."

**9.** On remand it was established that the trial judge had indeed sent his law clerk from Ohio, where the court sat, to the plaintiff's factory in

New York. After reviewing the record of the remand hearing, conducted before a different judge, a majority of the court concluded that reversal was not warranted because "the presumption of prejudice arising from the law clerk's report of off-the-record observations has been overcome." 649 F.2d at 420. The judge's error in sending the law clerk to the factory was held to be harmless. One judge disagreed, however, stating that such a "unilateral, irregular method of judicial investigation and decision ... turns the rules of evidence upside down and is clearly at odds with our adversary system of justice." *Id.* at 424–425 (dissenting opinion).

a patent omission in the testimony of a witness, a judge's substantial interference in the trial when there is no such omission can so prejudice the affected party as to require a new trial. *E.g., Haughton v. Byers, supra,* 398 A.2d at 20–21; *Petway v. United States,* 391 A.2d 798 (D.C.1978). At the close of appellant's testimony, no material fact was patently missing. When appellant was asked by the prosecutor on cross-examination whether he had a driver's license, he replied that he did not. If the prosecutor had not asked appellant this question, the trial judge certainly could have asked it for the benefit of the jurors. But that is as far as the judge could go. Guided by *Kennedy* and *Price Brothers, supra,* we hold that the trial judge erred in undertaking an off-the-record investigation to check appellant's veracity on this point. *See Greenhow v. United States, supra,* 490 A.2d at 1135–1136 (judge "exceeded his inherent authority" by giving prosecutor a document from the court file with which to impeach defendant's testimony). We must therefore decide if the error was harmless, since judicial interventions of this kind may be harmless when viewed in the context of the trial as a whole. *See, e.g., Glasser v. United States,* 315 U.S. 60, 82–83, 62 S.Ct. 457, 470–71, 86 L.Ed. 680 (1942); *Robinson v. United States,* 513 A.2d 218, 222 (D.C. 1986); *Greenhow v. United States, supra,* 490 A.2d at 1136; *Hurt v. United States,* 337 A.2d 215, 217 (D.C.1975).

■ When the judge reported to both counsel the results of his secretary's call, he told them that what he discovered could have helped either side. In this he was clearly mistaken. If the secretary had found out that appellant did not have a driver's license, nothing would have come of that information because it merely confirmed appellant's testimony. If, on the other hand, as happened, the secretary or law clerk discovered that appellant did have a driver's license, that discovery, if made known to the jury through the

government's reopened cross-examination, would both impeach appellant's credibility and undermine a critical part of his defense, *viz.,* his claim that he was not the driver of the car because he could not drive.[10] Because the judge's intervention substantially prejudiced the defense, we cannot find it harmless. *See Shannon v. United States, supra,* 311 A.2d at 502–505 (improper for court to question witness extensively and prompt the prosecutor that objections should be made); *United States v. Karnes,* 531 F.2d 214, 216–217 (4th Cir. 1976) (judicial impartiality destroyed when court produced new evidence which strengthened the government's case); *cf. Robinson v. United States, supra,* 513 A.2d at 222 (improper for court to suggest strategy and tactics to the prosecutor, but impropriety found harmless because defendant was acquitted of the pertinent charge).

The government relies heavily on our decision in *Greenhow v. United States, supra,* to support its contention that if there was error, appellant was not prejudiced. We find *Greenhow* distinguishable. The defendant in that case, in response to a question from the court on direct examination, said that he had been employed for four or five years. In the court's file, however, was a statement given to a court intake officer by the defendant, under oath, in which he said he was unemployed. At the conclusion of his direct testimony, the court called counsel to the bench and informed the prosecutor of the defendant's prior statement, which the court said the prosecutor could use "for whatever purposes he may wish to use it in cross-examination." 490 A.2d at 1135. With the aid of this statement, the prosecutor got the defendant to admit on cross-examination that he had not been employed at the time the offense was committed.

There are three significant differences between *Greenhow* and this case. First, in

---

**10.** The trial judge apparently recognized this when he said to defense counsel, "If somebody establishes that [appellant] has a driver's license, the defense would look pretty flimsy." At sentencing the judge remarked that if his action was error, it was probably not harmless, since there was "a reasonably good chance" that the reopened cross-examination contributed to the guilty verdict.

*Greenhow* the impeaching evidence was a sworn statement made by the accused to a court official. The statement was in the court file, and the judge had to look no further than the case jacket to find it. At appellant's trial, however, the judge went far beyond the court's own records and initiated an *ex parte* telephone call to obtain the information about the driver's license. Second, while in *Greenhow* the defendant's employment at the time of the crime "was an important element in his defense," 490 A.2d at 1136, the effect of the impeaching evidence was less damaging than in the instant case, since the defendant " 'was enabled to make a logical answer explaining his conduct ... consistent with his [defense] theory.' " *Id.* (citation omitted). Third, and most importantly, in *Greenhow* the information provided by the judge was used by the prosecutor in the normal course of trial events, *i.e.,* in the cross-examination of the defendant, to which the government was already entitled. In this case, by contrast, both sides had rested, and jury instructions were being prepared. Consequently, before the government could use the information given to it by the judge, it had to seek permission from the very same judge to reopen its cross-examination of appellant.

Whether to allow the government to reopen its case and present additional evidence is a decision entrusted to the discretion of the trial court; it is not a matter of right. *See In re E.R.E.,* 523 A.2d 998, 1000 (D.C.1987); *Brown v. United States,* 388 A.2d 451, 456–458 (D.C.1978). Here it was the court that gathered the evidence about the driver's license and gave it to the prosecutor, and it was the court that then exercised its discretion to permit the government to reopen its cross-examination of appellant in order to put that evidence before the jury. In these circumstances it was the court's exercise of discretion, more than anything else, that exacerbated the appearance of partiality. To rectify this, we might have been obliged to reverse appellant's conviction even if there had been no actual prejudice.[11] *See Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 2202–2206, 100 L.Ed.2d 855 (1988) (appearance of impropriety requires vacatur of judgment, even though judge was unaware of impropriety at the time of trial); *Rose v. Clark, supra,* 478 U.S. at 578, 106 S.Ct. at 3106 (traditional harmless error analysis presupposes an impartial judge); *Scott v. United States, supra* note 8, 559 A.2d at 752 (harmless error review "inappropriate where the appearance of impropriety taints the entire proceeding," citing *Liljeberg* ).

We do not deny that a trial judge has a duty to expose perjurious testimony whenever possible. *See Greenhow v. United States, supra,* 490 A.2d at 1137. Further, we have no doubt whatsoever that the judge in this case was impelled by the noblest of motives. Nevertheless, under our system of laws, a judge is not an investigator; the investigative function belongs to the parties and their agents. Laudable goals and lofty purposes cannot be attained when the cost is the loss, or even the appearance of loss, of judicial impartiality. In the classic words of Justice Frankfurter, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954); *see Scott v. United States, supra* note 8, 559 A.2d at 754 (trial judge's "inadvertent lack of appreciation of the significance of his conduct" did not mitigate appearance of impropriety); *Health Services Acquisition Corp. v. Liljeberg,* 796 F.2d 796, 802 (5th Cir.1986) (appearance of partiality is no less serious merely "because the judge is pure in heart and incorruptible"), *aff'd,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). When the roles of neutral magistrate and parti-

11. For this important ruling, involving evidence which the trial court itself thought might have been determinative, see note 10, *supra,* appellant was entitled to a judge unaffected by improper participation in the events that made the ruling necessary. Obviously, the evidence was as readily available to the prosecutor before or during trial as it was to the court. It would not have been an abuse of discretion for a trial court to rule that the belated discovery of such evidence by the prosecutor did not warrant the reopening of the case. *See In re E.R.E., supra,* 523 A.2d at 1000.

san prosecutor become intertwined as they did in this case, the defendant's right to an impartial decision-maker is denied. *See United States v. Marzano, supra,* 149 F.2d at 926.

Appellant's convictions are therefore reversed. The case is remanded for a new trial or for other proceedings consistent with this opinion.

*Reversed and remanded.*