**Thaddeus FOSTER, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 90–CF–1069.**

District of Columbia Court of Appeals.

Argued March 12, 1992.
Decided Oct. 6, 1992.

S. Pamela Thomas, Public Defender Service, with whom James Klein, Public Defender Service, and Page Kennedy, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Peter R. Zeidenberg, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Clifford T. Keenan, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

ROGERS, Chief Judge:

Appellant Thaddeus Foster contends that he is entitled to be resentenced by a new judge because of the trial judge's *ex parte* communication, in violation of Canon 3(A)(4) and Canon 3(C)(1) of the Code of Judicial Conduct, with the D.C. Parole Board regarding its recommendation that appellant be sentenced under the D.C. Youth Rehabilitation Act, D.C.Code § 24–803 (1991 Supp.). The trial judge acknowledged, prior to sentencing appellant as an adult,[1] that he had initiated an *ex parte* communication with the Parole Board and declined to hold a hearing when the Board thereafter changed its recommendation to favor adult sentencing of appellant. We hold that the judge violated the canons, but conclude in view of the judge's broad sentencing discretion that the errors do not entitle appellant to resentencing before another judge.

I

Appellant was charged in a six count indictment regarding two separate incidents: a February 27, 1989, armed attack on Terry Brown,[2] and the June 29, 1989, murder of Carlton Allen.[3] Appellant entered into a plea agreement with the government whereby he agreed to plead guilty to assaulting Mr. Brown with intent to kill and carrying a pistol without a license during the same incident, and the government agreed to dismiss the remaining charges, including all counts relating to the murder of Mr. Allen.

On May 1, 1990, prior to sentencing, the trial judge granted appellant's request for a continuance, to July 9, 1990, so that he could be evaluated for sentencing under the Youth Rehabilitation Act. D.C.Code § 24–803(e); 28 DCMR § 230 (1987). After conducting its study of appellant in accordance with 28 DCMR § 230.1 (1987), the Classification Committee reported its findings and conclusions to the D.C. Parole Board, including that the Youth Center did not appear to be an appropriate placement

---

1. Appellant pled guilty to assault with intent to kill, D.C.Code § 22–501 (1989 Repl.), and carrying a pistol without a license, id. § 22–3204, and the trial judge sentenced him to imprisonment for four to twelve years with one year consecutive imprisonment for the pistol offense.

2. With respect to the attack on Mr. Brown, appellant was charged with one count of assault with intent to kill, D.C.Code §§ 22–501, –3202, one count of carrying a pistol without a license, D.C.Code § 22–3204(a), and one count of pos-

sessing a firearm during a crime of violence, D.C.Code § 22–3204(b).

3. With respect to the murder of Mr. Allen, appellant was charged with one count of possessing a firearm during a crime of violence, D.C.Code § 22–3204(b), one count of first degree murder while armed, D.C.Code § 22–2401, –3202, and one count of carrying a pistol without a license, D.C.Code § 22–3204(a).

for appellant.[4] Thereafter, the Parole Board submitted its written recommendation on July 5, 1990, to the trial judge that appellant be sentenced under the Youth Rehabilitation Act.[5] Four days later, on July 9, 1990, the Parole Board submitted a new report to the trial judge recommending that appellant be sentenced as an adult.[6] Although the reasons for the Parole Board's decision to change its recommendation are unclear, the apparent impetus for the change was an *ex parte* communication initiated by the trial judge.

On July 9, 1990, the trial judge stated in open court that he had contacted Mr. Croft, the member of the Parole Board who had signed the Parole Board's July 5th report, because its recommendation was inconsistent with the Classification Committee's recommendation.[7] Defense counsel took issue with the judge's view that the July 9th

Parole Board report stated that appellant should not be placed at the Youth Center, and said, "I think this letter in light of the original letter that Mr. Croft sent is somewhat distressing." The judge, maintaining that the July 9th Report recommended sentencing appellant as an adult, advised that "I am not going to sentence him under the Youth [Rehabilitation] Act." However, the judge agreed to continue sentencing so that defense counsel could inquire of the Parole Board about its recommendation; the judge rejected defense counsel's request to subpoena witnesses for a hearing to determine how the Parole Board reached its July 9th decision.

At the sentencing hearing on August 1, 1990, the trial judge again referred to the two Parole Board recommendations and his intervening discussion with Mr. Croft.[8]

4. The Classification Committee's findings and conclusions stated, in pertinent part:

   [Appellant] has involved himself in the lucrative but dangerous drug subculture as a means of support and acceptance. [Appellant's] actions in the community are of great concern as it exhibits as [sic] an over-compensatory means of dealing with feelings of weakness. There appears to be no community support at this time and his pattern of involvement is escalating. His needs as assessed by the Classification Committee indicate he could benefit from enrollment in an adult education program to earn his GED, psychological counseling to assist him in resolving his intrafamily issues and provide him with insight into his negative behavior, vocational training to prepare him for the work force, and drug counseling to enlighten him on the dangers associated with this activity. Furthermore, in light of his pattern of involvement, the Youth Center does not appear to be an appropriate setting to redirect his energies. The Classification Committee's report erroneously described the offense to which appellant pled guilty as "Assault With Intent to Kill while Armed." Appellant actually pled guilty to assault with intent to kill and carrying a pistol without a license. The trial court's order committing appellant for a Youth Rehabilitation Act study also misstated appellant's conviction.

5. The Parole Board's July 5th report, signed by Howard R. Croft, stated in pertinent part:

   The Board of Parole recommends incarceration under YRA guidelines. [Appellant] has three arrests as a juvenile with no adjudications. As an adult, Mr. Foster has incurred three arrests with the instant offense representing his only conviction.

[Appellant] completed the eighth grade, but was then expelled for fighting. He has no significant work history or vocational skill. He is [a] product of an unstable home. [Appellant] is unlikely to address his needs outlined in the Evaluation Study without benefit of a structured setting such as the Youth Center.

6. The Parole Board's July 9th report emphasized appellant's violent behavior (see underlined language), and was also signed by Mr. Croft, and stated in pertinent part:

   The Board of Parole recommends sentencing as an adult. [Appellant] has three arrests as a juvenile with no adjudications. As an adult, [appellant] has incurred three arrests with the instant offense, a violent crime, representing his only conviction. [Appellant] completed the eight grade, but was then expelled for fighting. He has no significant work history or vocational skill. A product of an unstable, chaotic home, [appellant] appears to compensate for feelings of weakness through aggressive, violent behavior. Placement in the Youth Center is not considered appropriate. [Emphasis Added]

7. The judge explained: "What puzzled me was [the] recommendation of the [B]oard in view of [appellant's] behavior and in view of the fact that there was a person killed in the matter." Defense counsel pointed out, however, that the government had dropped the murder charges as part of the plea bargain with appellant.

8. The trial judge stated that:

   A superseding letter was received which was written after I discussed the matter with Mr. Croft. Mr. Croft on [sic.] the July 5th letter

Defense counsel informed the judge that the Parole Board members had, consistent with Board policy, refused to speak with her, but that a supervisor at the Parole Board, who was not involved in making the recommendation, had expressed the view that the recommendation was ambiguous and that "it was not completely clear to her that they meant adult incarceration versus community supervision." The trial judge interjected, "The decision was not ambiguous," and thereafter denied defense counsel's request to subpoena witnesses, explaining that "[t]hey have no obligation whatsoever to give you the reason that they came to the conclusion that they did." Over defense counsel's objection, the trial judge proceeded to sentence appellant to four to twelve years imprisonment for assault with intent to kill and one year of consecutive imprisonment for carrying the pistol without a license, finding that appellant would not benefit from being sentenced under "the Youth Correction Act."

## II

Canon 3(A)(4) of the Code of Judicial Conduct provides that:

> A judge should accord to every person who is legally interested in a proceeding, or his [or her] lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.

Canon 3(C)(1) of the Code of Judicial Conduct provides in pertinent part that:

> A judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned.

. . . . .

The underlying reason for the prohibitions of both Canon 3(A)(4) and Canon 3(C)(1) is to prevent the "actual or apparent partiality [which] undermines the 'confidence in the judiciary . . . essential to the successful functioning of our democratic form of government.'" *Belton v. United States,* 581 A.2d 1205, 1214 (D.C.1990) (quoting *Scott v. United States,* 559 A.2d 745, 748 (D.C. 1989) (en banc)).[9]

### A

The trial judge admitted that he initiated *ex parte* communications with Mr. Croft of the Parole Board to resolve what he viewed as an apparent inconsistency between the Parole Board's initial recommendation and the Classification Committee's report about how appellant should be sentenced. In denying defense counsel's request for a hearing concerning the change in the Parole Board's recommendation, the trial judge stated, "I talked to them. I called. I was the one who said I don't understand how [the Board could] make that recommendation in view of the Classification Committee's report." Appellant contends that the *ex parte* communications ultimately influenced the trial judge's sentencing decision by causing the Parole Board to change its recommendation.

Canon 3(A)(4) is worded in the disjunctive, prohibiting both (1) initiating *ex parte* communications and (2) considering *ex parte* communications in rendering a decision. An *ex parte* communication clearly occurred when the trial judge spoke to Mr. Croft over the telephone at some time between the dates of the Parole Board's first and second reports. In this context, the concern underlying the Canon would appear to be to avoid the situation in which the sentencing judge might attempt to influence the entity or person that is

---

had indicated that they recommended incarceration under the Youth Correction Act. I noted that the Classification Committee stated in the last sentence of their report, the defendant's pattern of involvement at the Youth Center does not appear to be an appropriate setting to redirect his energies. I couldn't understand the recommendation of the Parole Board, and therefore I called and as a result

there was a further study and on July 9th I received a letter that the Parole Board recommended sentencing as an adult.

9. *See Scott, supra,* 559 A.2d at 748 n. 6 & Appendix (American Bar Association 1972 Code of Judicial Conduct, as approved and amended by the Joint Committee on Judicial Administration, applies to District of Columbia judges).

charged with the responsibility of providing the trial judge with an independent recommendation on the appropriate sentence for a defendant.[10] We conclude that sentencing falls within the phrase "the merits or procedures affecting the merits of a pending or impending proceeding." Although the commentary to the ABA Model Canon suggests that the proscription against communications concerning a proceeding "does not preclude a judge from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out his [or her] adjudicative responsibilities," we do not interpret this commentary to refer to non-judicial branch personnel. ABA CODE OF JUDICIAL CONDUCT (adopted August 1972, as amended August 1984) at 01:3002.

As to appellant's claim that the trial judge also violated Canon 3(A)(4)'s prohibition against considering *ex parte* information, the record is incomplete. The trial judge denied the defense request for a hearing on the reasons for the Parole Board's decision to change its recommendation, and hence our knowledge of what transpired during the telephone conversation between the trial judge and Mr. Croft of the Parole Board is limited to the trial judge's statements on the record about his conduct; there is nothing else in the record to indicate what Mr. Croft of the Parole Board said to the judge during their conversation.

■ Nevertheless, we are unpersuaded by appellant's contention that there was a violation of the canon because the judge considered the *ex parte* communication in his sentencing deliberations. The Parole Board's July 9th report was not, itself, an *ex parte* communication since it was on the record, thereby enabling the prosecution and the defense to question its foundation. *See Belton, supra,* 581 A.2d at 1214.

Rather, the *ex parte* communication took place when the trial judge spoke to Mr. Croft over the telephone at some time between the Board's first and second reports. Although Mr. Croft appears to have changed the Board's recommendation based on his telephone conversation with the trial judge, the canon does not regulate the manner in which the Board makes its decisions.

Consequently, the relevant issue is whether the trial judge considered *ex parte* communications from Mr. Croft in deciding how to sentence appellant. We look to the judge's statements at the several sentencing hearings explaining why he had contacted Mr. Croft and stating his intention not to sentence appellant under the Youth Rehabilitation Act, as well as his colloquy with appellant on the date he was sentenced. There is nothing to suggest that Mr. Croft communicated information to the trial judge that was not otherwise known to the trial judge as a result of other sentencing reports about appellant. Appellant does not suggest to the contrary. Nor does appellant suggest that he was not privy to the reports about him. Consequently, in view of the nature of appellant's contention, that it was the consideration of the revised recommendation of the Parole Board that constituted a violation of Canon 3(A)(4), we find no violation of the "consider" prohibition of the canon, only a violation of the "initiate" prohibition of Canon 3(A)(4).

Some federal courts have held that a judge's *ex parte* communications with a probation officer concerning sentencing are permissible. *See, e.g., United States v. Gonzales,* 765 F.2d 1393, 1398 (9th Cir. 1985), *cert. denied,* 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986); *United States v. Story,* 716 F.2d 1088, 1090 (6th Cir.1983).

---

**10.** Because the Youth Rehabilitation Act, passed by the Council of the District of Columbia to "fill the void created by congressional repeal of the Federal Youth Corrections Act," is patterned after the federal act, see COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 6–47, "YOUTH REHABILITATION ACT OF 1985," at 2 (June 19, 1985), interpretations of the federal act are instructive here. *See Dorszynski v. Unit-*

*ed States,* 418 U.S. 424, 458, 94 S.Ct. 3042, 3060, 41 L.Ed.2d 855 (1974) ("§ 5010(e) ... provides a mechanism for the trial court to secure the expert assistance of correctional authorities in determining whether an eligible offender would benefit from treatment" under the Act) (Marshall, J., concurring); *United States v. Adkins,* 530 F.2d 862, 863 (10th Cir.1976) (same, expert advice).

The government suggests, relying on these decisions, that the judge's *ex parte* contact with Mr. Croft was not violative of Canon 3(A)(4). However, these cases involved probation officers who were functioning as an arm of the court. By contrast, the Parole Board is an independent, non-judicial branch entity, whose members are appointed by the Mayor subject to confirmation by the Council of the District of Columbia.[11] The Parole Board is expressly vested with statutory responsibility for providing expert advice to the trial court on whether a defendant would benefit from sentencing under the Youth Rehabilitation Act. D.C.Code § 24–807; 28 DCMR § 230.2 (Parole Board's report to "summarize the [Corrections Department Classification Committee's] findings and recommend what the Board considers to be the best available treatment plan"). The Parole Board, therefore, is a substantially different entity than the social services division of the Superior Court of the District of Columbia whose employees prepare presentence disposition reports. Therefore, we cannot agree with the government's contention that the *ex parte* communications initiated by the trial judge did not violate Canon 3(A)(4).

We are not unmindful of the indications in the record that the trial judge may possibly have viewed the Parole Board as functioning in the same manner as a probation officer who prepares a presentencing report. *See* Super.Ct.Crim.R. 32(b)(3)(E) (Parole Board reports shall be considered presentence investigations within the meaning

of paragraph (b)(3) of this rule). The trial judge could, of course, properly view the Parole Board's role as designed to provide assistance to him in sentencing, and thereby also reasonably be concerned about understanding the Board's initial recommendation and the Classification Committee's findings.[12] On the other hand, the Parole Board is an independent agency, and the Youth Rehabilitation Act is reasonably construed as contemplating that an independent recommendation is to be provided to the sentencing judge. *See* note 10, *supra.* The record also suggests that the trial judge may have thought that what he perceived to be an inconsistency presented a problem that had to be resolved in a manner that was consistent with the Classification Committee's report. However, nothing appears to require the Parole Board to follow the recommendation of the Classification Committee.[13] More importantly for our purposes, it was unnecessary for the judge to initiate an *ex parte* communication. Canon 3(A)(4) "imposes a duty on trial judges 'to avoid off-the-record contacts that *might* influence the outcome of the litigation,' " *Davis v. United States,* 567 A.2d 36, 40 (D.C.1989) (per curiam) (quoting *Price Brothers Co. v. Philadelphia Gear Corp.,* 629 F.2d 444, 447 (6th Cir.1980) (emphasis added), *after remand,* 649 F.2d 416, *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981)), and there are other ways that the judge could have satisfied himself about any inconsistency.[14]

11. See D.C.Code § 24–201.1 (1989 Repl.) (Parole Board consists of five members, appointed for five-year terms). Both the Parole Board and the Department of Corrections, which have joint responsibility for conducting a Youth Rehabilitation Act Study, D.C.Code § 24–803(e), are part of the Executive Branch of the District of Columbia government. D.C.Code §§ 24–201.-1(a), –441, 1–299.6. Pursuant to D.C.Code § 24–803(e), the chairperson of the Parole Board has promulgated regulations dividing responsibility between the Corrections Department and the Parole Board for completing a Youth Rehabilitation Act study. 34 D.C.Reg. 2118 (March 10, 1987); 28 DCMR §§ 230.1, 230.2 (1987).

12. Trial court concern about the inadequacy or ambiguity of comparable reports is not unknown. *United States v. Norcome,* 375 F.Supp.

270, 275 (D.D.C.1974); *United States v. Tillman,* 374 F.Supp. 215, 226–27 (D.D.C.1974).

13. In the instant case, moreover, the Classification Committee's findings incorrectly stated the offense to which appellant had pleaded guilty. See note 4, *supra.*

14. See, e.g., *Tillman, supra* note 12, 374 F.Supp. at 220 (upon concluding further inquiry was required, judge sent a questionnaire, requested clarification and conducted a hearing); *Norcome, supra* note 12, 375 F.Supp. at 273 (upon concluding first report provided inadequate statement of reasons for conclusion, judge ordered a second study and report, and upon finding second report inadequate, held a fact-finding hearing with persons who had prepared

B

In applying Canon 3(C)(1) the court has been mindful of the Supreme Court's admonition in *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 2205, 100 L.Ed.2d 855 (1988), that "[w]e must continuously bear in mind that to perform its high function in the best way justice must satisfy the appearance of justice." *Belton, supra,* 581 A.2d at 1214. We conclude that the trial judge did not appropriately consider whether his *ex parte* communication with Mr. Croft and the Parole Board's changed sentencing recommendation thereafter, might create an appearance of partiality in violation of Canon 3(C)(1).[15] *See id.* at 1213.

Initiating an *ex parte* contact may not always lead a reasonable person to infer partiality. Thus, where a judge is attempting to understand a conflict between written recommendations that are presented, an objective observer could view the trial judge's efforts here as those of a conscientious jurist trying to understand a recommendation before making up his mind. On the other hand, the appearance of partiality arises precisely because the Parole Board initially recommended Youth Rehabilitation Act sentencing for appellant and then, only after the trial judge spoke with the member of the Parole Board who signed its report, reversed its position by issuing a superceding recommendation that appellant be sentenced as an adult. The appearance is only heightened by the fact that we do not know on this record whether the judge expressed his views regarding sentencing when he spoke to Mr. Croft, or whether Mr. Croft provided any information to the judge that was not included in the Board's

July 9th report. We do know that the Parole Board's July 9th report included new language about the violent nature of the underlying offenses that was similar to the views expressed by the judge upon imposing sentence on appellant. We conclude that these circumstances could have caused an objective observer to conclude that the judge's *ex parte* communication with the Parole Board was an attempt to generate greater support on the record for his view of appropriate sentence for appellant in the form of a changed recommendation.

III

■ The question remains whether the canon violations were harmless. This court's decisions betray some uncertainty concerning the proper standard by which to determine whether an apparent breach of the duty of impartiality by a judge requires reversal of the judgment. *Compare Davis, supra,* 567 A.2d at 41 (applying criminal harmless error standard to violation of Canon 3(A)(4)), *with Scott, supra,* 559 A.2d at 747 (en banc court adopting the special three-part harmless error test of *Liljeberg, supra,* 486 U.S. at 864, 108 S.Ct. at 2204, for violation of Canon 3(C)(1)).[16] *See also In re J.A. & L.A.,* 601 A.2d 69, 78 (D.C.1991) (applying *Liljeberg* special harmless error test to intemperate courtroom conduct reflecting bias); *id.* at 80 (Pryor, J. concurring and dissenting) (same, subject to review "more akin to the usual review for harmless error"). *But see Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3105, 92 L.Ed.2d 460 (1986) (traditional harmless error analysis presupposes an impartial judge).[17] There is no difficulty,

recommendations); *see also United States v. Dancy,* 166 U.S.App.D.C. 399, 405, 510 F.2d 779, 785 (1975) (court may require detailed explanation, seek supplementation and inquire into manner of preparation).

15. The standard for assessing whether the trial judge violated Canon 3(C)(1) turns on whether his actions would "lead 'an objective observer,' [*Liljeberg, supra,* 486 U.S.] at 861 [108 S.Ct. at 2203] ... reasonably to question the judge's impartiality." *Belton, supra,* 581 A.2d at 1214. Because the canon concerns the appearance of,

as well as actual, partiality, the court must consider "the way events actually appeared." *Id.*

16. In *Davis, supra,* the court adverted to the *Liljeberg* standard, 567 A.2d at 42, but did not reach the issue of whether it applied.

17. During oral argument the government suggested that the *Liljeberg* special standard of review should be applied in this case. In light of *Rose v. Clark, supra,* 478 U.S. at 578, 106 S.Ct. at 3105, it is difficult to understand the rationale for applying a lesser harmless error standard to

however, requiring resolution of the proper standard, because we conclude that the outcome will be the same under either test.

### A

Under the harmless error test applied generally in criminal cases, *see Davis, supra*, 567 A.2d at 42, we find no ground for remanding the case for resentencing before another judge. Although, as we have noted, the record is silent on what may have been said by Mr. Croft to the trial judge during their telephone conversation, we see no need for a remand for an evidentiary hearing. *See Price Bros. Co. v. Philadelphia Gear Corp., supra*, 629 F.2d at 447 (remand for evidentiary hearing on alleged conduct of trial judge in sending law clerk to view subject matter of ligitation); *see also Standard Alliance Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813 (6th Cir. 1978) (presumption of prejudice where judge engaged in *ex parte* contacts with jury). This case does not involve a situation in which the person with whom the trial judge spoke appeared to have knowledge of facts which, if communicated, might affect the trial judge's deliberations. There is no suggestion that the trial judge's contact with Mr. Croft was motivated by a desire to obtain *ex parte* facts. Nor is there reason to believe that Mr. Croft was privy to any information not already possessed by the trial judge that might have affected the trial judge's no-benefit determination under the Act. Appellant does not suggest to the contrary. Hence, the contact that occurred here is not the type that would raise a presumption of prejudice. *Cf. United States v. Gypsum*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) (judge's contact with jury foreman involved supplemental instruction to jury). Accordingly, because nothing in the record suggests that the trial judge's initiation of an *ex parte* communication regarding sentencing either biased the trial judge's opinion or caused the trial judge to receive *ex parte* information that appellant had no opportunity to challenge, we conclude the trial judge's viola-

tion of Canon 3(A)(4) did not substantially prejudice appellant. *See Glasser v. United States*, 315 U.S. 60, 82–83, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942); *Davis, supra*, 567 A.2d at 41; *Robinson v. United States*, 513 A.2d 218, 222 (D.C.1986); *Greenhow v. United States*, 490 A.2d 1130, 1136 (D.C. 1985).

### B

According to the *Liljeberg* test, the court's inquiry is more comprehensive. The court must consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg, supra*, 486 U.S. at 864, 108 S.Ct. at 2205. We apply that test to the violation of Canon 3(C)(1). *Scott, supra*, 559 A.2d at 747.

First, the risk to the parties. Undoubtedly, the risk of injustice to the government of granting appellant requested relief is diminished because "only a resentencing, not a retrial, is involved." *Belton, supra*, 581 A.2d at 1215. By contrast, the risk of injustice to appellant and to other potential defendants from a perception that a trial judge would seek to influence the Parole Board's sentencing recommendation is potentially greater. Nevertheless, unlike previous cases before this court, the canon violations here involve sentencing, which is usually a highly discretionary function of the trial judge, and not the adjudicatory part of the trial, which does not involve the exercise of any comparable discretion by the judge. A trial judge generally may consider information from a wide variety of sources in evaluating the appropriate sentence for a defendant. *See Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Belton, supra*, 581 A.2d at 1213 (and cases cited). While the defendant has the right to be informed of any such information, *see Caldwell v. United States*, 595 A.2d 961, 967 (D.C.1991); Super.Ct.Crim.R. 32(b)(3)(A), the defendant does not have a right to cross-examine per-

---

an actual impropriety under Canon 3(C) than to

apparent improprieties under that canon.

sons providing information to the judge in connection with sentencing. *See Powers v. United States*, 588 A.2d 1166, 1172 (D.C. 1991). Further, although the Youth Rehabilitation Act is premised on the assumption that expert advice will aid the trial judge in deciding whether a defendant should be sentenced under the Act, the sentencing judge is not required to follow the experts' recommendations. *See Dancy, supra* note 14, 166 U.S.App.D.C. at 405, 510 F.2d at 785. Consequently, it is significant that appellant had an opportunity to challenge the Parole Board's revised sentencing recommendation of July 9th, as well as the judge's apparent initial misperception about the facts underlying appellant's guilty plea,[18] and that the trial judge informed appellant that he had read the letters from appellant's family and members of his community who recommended against adult imprisonment. In other words, appellant not only had the opportunity to address the Board's recommendation but he was assured by the trial judge that the other recommendations more favorable to appellant had also been considered by the judge prior to imposing sentence.

This is not, however, to suggest that what happened in this case is not troubling. Appellant heard the trial judge announce that he had contacted the Parole Board on the basis of a perceived inconsistency, and appellant knew that the Parole Board had thereafter changed its recommendation in support of harsher sentencing for him. Appellant might well have thought that the judge sought to influence the Parole Board's recommendation in order to obtain greater support for his own views. Balanced against this negative impression is the fact that appellant also heard the judge say as early as July 9, 1990, that he was not going to sentence appellant under the Youth Rehabilitation Act. Appellant also

heard the judge state that the Parole Board was under no obligation to explain its recommendation, and appellant's counsel did not challenge that statement. Further, appellant was aware that, notwithstanding the letters from appellant's family and community, the judge was particularly concerned about the violent nature of appellant's conduct and his involvement in the illegal drug trade. Indeed, it was this concern that caused the judge to contact the Parole Board about its initial recommendation. Under these circumstances, it cannot reasonably be thought that, whatever the Parole Board's recommendation, the trial judge intended to sentence appellant other than as an adult.

Second, the risk of injustice to others. Our concern regarding danger of injustice for future cases is lessened by two facts. First, the violation of Canon 3(C)(1) (judge must maintain actual and apparent impartiality) is a direct result of the violation of Canon 3(A)(4) (prohibiting *ex parte* communications), and this court has previously admonished against *ex parte* communications in the course of adjudication. *See Davis, supra*, 567 A.2d at 40. We do so again, this time expressly with regard to sentencing. Second, this opinion will remove uncertainty about the propriety of judicial *ex parte* contacts with Executive Branch entities having statutory responsibilities to advise the trial court on a pending proceeding; there should be no such contacts in the future since other avenues are available to fulfill the needs of the sentencing judge. *See* note 14, *supra*. Consequently, we are unpersuaded by the argument that to withhold resentencing here (with a new Youth Rehabilitation Act study) will cause "judges [to] relax their guards against appearances of impropriety," *Belton, supra*, 581 A.2d at 1215, and to initiate *ex parte* contacts with the Parole Board concerning Youth Rehabilitation Act

---

18. *See*, by contrast, *Belton, supra*, 581 A.2d at 1205 ("Someone who heard what went on at sentencing and never learned of the aftermath, *i.e.*, the [trial] judge's explanation, would assume that the judge went outside of the record

for information germane to sentencing—information [the defendant] Cowan had no opportunity to dispute"); *id.* at 1214 (the defendant "could not effectively challenge this information

reports.[19] This opinion reaffirms the independence of the Parole Board in making its sentencing recommendations to the trial court, and it should alleviate any concern by other defendants about the source of the Board's sentencing recommendations.

Third, the risk of undermining public confidence. The very breadth of sentencing discretion mitigates our normal concern about the risk of undermining the public's confidence in the judicial process as a result of canon violations. *See Scott, supra,* 559 A.2d at 748. The *ex parte* communication that occurred here was improper. But to the extent that the trial judge viewed the Parole Board as acting similarly to the probation officers, the trial judge was acting in a conscientious way, albeit in a manner inconsistent with Canon 3(A)(4)'s proscription for nonjudicial personnel. Appellant makes no claim that the trial judge received adverse information to which appellant could not respond. *See People v. Webster,* 192 Cal.Rptr. 86, 89, 143 Cal. App.3d 679, 684 (1983). Further, although there was a basis for a different evaluation of the appropriate sentence for appellant, a fully informed person would agree that the trial judge's evaluation was consistent with his legitimate concern about the violent nature of the offenses to which appellant had pleaded guilty.

Accordingly, we affirm the judgment.

in the way a defendant can ... question the foundation of a presentence report").

**19.** A judge is necessarily sensitive to the potential effect, whether intended or not, of his or her communications, as a member of the Judicial Branch of government, on an appointee of another branch of government with statutory responsibility for advising the court in a pending proceeding.