656 A.2d 1123 (1995)
In re W.T.L., Appellant.
No. 94-FS-1326.
District of Columbia Court of Appeals.
Argued January 11, 1995.
Decided March 23, 1995.
*1124 Jaclyn S. Frankfurt, with whom James Klein and Samia Fam were on the brief, for appellant.
Sidney R. Bixler, Asst. Corp. Counsel, with whom Erias A. Hyman, Acting Corp. Counsel at the time the brief was filed, Robert R. Rigsby, Deputy Corp. Counsel, and Rosalyn Calbert Groce, Asst. Corp. Counsel, were on the brief, for appellee.
Before SCHWELB and FARRELL, Associate Judges, and GREENE, Associate Judge of the Superior Court of the District of Columbia.[*]
GREENE, Associate Judge of the Superior Court of the District of Columbia:
On June 10, 1994 the District of Columbia filed a petition in the Family Division of the Superior Court charging appellant, W.T.L., with assault with intent to kill while armed (D.C.Code §§ 22-501 (1989 Supp.), -3202 (1994 Supp.)), malicious disfigurement while armed (D.C.Code §§ 22-506 (1989 Supp.), -3202 (1994 Supp.)), assault with a dangerous weapon (D.C.Code § 22-502 (1989 Supp.)), threats (D.C.Code § 22-507 (1989 Supp.)) and obstruction of justice (D.C.Code §§ 22-722(a)(5) (1989 Supp.)). Following an initial hearing, probable cause was found, appellant was detained, and his case was continued until July 7, 1994 for a status hearing. Meanwhile, on July 5, 1994, the government filed a motion to transfer appellant to the Criminal Division for trial pursuant to D.C.Code § 16-2307 (1994 Supp.). After a transfer hearing during portions of nine days from October 3 to October 18, 1994, Judge Mitchell granted the government's transfer request but stayed the transfer order for 30 days. A notice of appeal was filed on October 20, 1994. On October 28, 1994, this court granted a joint motion to expedite the appeal and stay the transfer order pending appeal.
Before this court appellant asserts that the transfer statute, D.C.Code § 16-2307, is unconstitutional, both on its face and as applied to him. He argues that it creates an irrebuttable presumption of guilt and, consequently, violates his due process right to challenge the evidence against him. Additionally, appellant alleges that the hearing judge violated the Code of Judicial Conduct by initiating an ex parte communication with another juvenile concerning appellant during an unrelated court proceeding involving the other juvenile. Neither appellant nor his counsel were present at that proceeding. Consequently, appellant contends that this case should be remanded for a new transfer hearing before a different judge.
For the reasons which follow, we reject appellant's contentions and affirm the transfer order.

I.
Appellant, his mother, his counsel and a social worker were present at appellant's initial hearing on June 10, 1994. Officer LaVerne Battle of the Metropolitan Police Department testified at the hearing that two days earlier appellant had gone to the home of Cathy Larker, an eyewitness who had testified against appellant in his trial for first degree murder in 1990 when appellant was thirteen years old.[1] According to Officer Battle, appellant approached Ms. Larker from behind with a 40-ounce bottle in his hand and "broke it across her head." When she turned to face appellant, he repeatedly struck her in the face and mouth with the broken bottle, causing cuts on her face requiring over 100 stitches. After the victim fell to the ground, appellant kicked her several times in her feet and legs. During the attack, appellant told Ms. Larker that he would continue to harass and assault her "until she was dead." Officer Battle testified that the following day Ms. Larker learned from another person that appellant told that person he was going to kill Ms. Larker and had not done so during the initial assault *1125 because children were present. When appellant was arrested and told by Officer Battle only that he was wanted in connection with an assault, he stated to the officer that he "didn't cut the lady." Shortly after his arrest appellant was identified by Ms. Larker as her assailant.
During the first five days of appellant's transfer hearing between October 3 and October 12, 1994, the trial judge heard extensive testimony reflecting, inter alia, that appellant had responded positively to several residential placements he had experienced since his murder adjudication in 1990. This testimony indicated that appellant not only had matured and apparently had learned to deal with his own anger and other problems he had confronted after growing up in a dysfunctional family environment,[2] but had been helpful in assisting and counselling his peers in several residential facilities to overcome similar problems.
During a recess in appellant's transfer hearing on October 13, 1994, the judge began a disposition hearing in an unrelated case of P.L., a sixteen-year-old juvenile charged with murder who said he aspired to be a hired killer and who, like W.T.L., had previously been convicted of murder and had experienced a difficult childhood. Unlike W.T.L., however, P.L. never had been in a residential placement. In the middle of P.L.'s hearing during a colloquy with him about the prospect of a residential placement and the need for P.L. to change his "approach to people" and to "grow up," the hearing judge remarked to P.L. on the record, "I would like to see you ... fool them all. You made a big mistake in your lifethe I.Q. say[s] that you [have] a little sense." Then, referring to W.T.L., the judge continued:

I'd like to see youI'd like to see you come back here as clean cut as this boy on this transfer case, change your whole appearance and start thinking about yourself. You understand that?
(Emphasis added.)
When P.L. responded "yeah," the judge inquired whether P.L. knew appellant, apparently hoping to reinforce in P.L.'s mind the positive example of appellant:
THE COURT: Do you know who what's that boy's name?
THE RESPONDENT: W[.] L[.].
THE COURT: You know him? You see how clean cut he is?

THE RESPONDENT: Yeah.
(Emphasis added.)
Learning that P.L. was acquainted with appellant, the judge inquired further:
THE COURT: What do you think about him? What do you think about him? Is heis he faking me?

[P.L.]: Nah. He is programming.

THE COURT: He's all right?

[P.L.]: He be programming.

THE COURT: Huh?

[P.L.]: He be programming.

THE COURT: He be programming?

[P.L.]: Umm-mm.

THE COURT: What does that mean? Tell me about that[.] He know[s] how to talk to [j]udges and things like that. Is that what you mean?

[P.L.]: He doinghe doing the right thing.

THE COURT: He is?

[P.L.]: Yes.

THE COURT: Does he try to help you? He talked to you?

[P.L.]: Sometimes.

THE COURT: What has he said to you that's worth anything?

[P.L.]: He be tellinglike he behe be working alot around grounds. He belike the O.D. pulled him for landscaping here. He had asked me do I want to help him and stuff like that. To keep me out of trouble or whatever.

THE COURT: And you go with him?
[P.L.]: Yes.

*1126 THE COURT: For landscaping?
[P.L.]: Yes.
(Emphasis added.)
Learning that P.L. might have some inclination towards landscape work, the hearing judge continued his discussion, finding out that P.L. also was interested in auto mechanics, that he liked to fix things, that he could read at the eighth or ninth grade level, and what courses he was taking. The judge then returned to the theme of encouraging P.L.'s interest in a residential placement, again using appellant as an example:
THE COURT: Whyyou don't want to be in one of those places like L[.] went to? Why ... don't [you] want to go there? Don't you think somebody shaped him up? You ever thought about that?
[P.L.]: I thought about it.
THE COURT: Well, why don't you why don't you consider going to one of those places like that? That's justsometimes guys go to those places and come out[. It's] just like going to college.
(Emphasis added.)
Following a further extended colloquy with P.L. during which he encouraged P.L. to benefit from rehabilitation efforts and exhorted him to understand that his performance during his commitment would determine when he would be released, the hearing judge reminded P.L. again of the example of appellant:
THE COURT: Okay. If you understand that then it's up to you then, isn't it?
[P.L.]: Yes.
THE COURT: Do you think that L[.] has L[.] had any influence on you?

[P.L.]: On me?

THE COURT: Yes. Has he helped you or hurt you?

[P.L.]: He help me a little bit. He be keeping me out of trouble.

THE COURT: Do you think he's smarter than you are?
[P.L.]: Nah, I'm smart.
THE COURT: You're smart. But he knows some things you don't know, right?
[P.L.]: A little bit, a little bit more than me.
THE COURT: He knows a little bit more than you?
[P.L.]: Yeah.
THE COURT: And, heand he's trying to get you to do the right thing over there?

[P.L.]: Yes.

THE COURT: Does he do that for other guys too?

[P.L.]: Like some of the people. Like they be constantly getting in trouble, he don't waste his time messing with `em.

(Emphasis added.)
The judge then proceeded to explain to P.L. that he (the judge) was like that and he could "spend but so much time with you," emphasizing that it would be P.L.'s responsibility to improve, to "become the leader." This colloquy prompted one further inquiry[3] related to appellant:
THE COURT: [to P.L.'s counsel] And, ifthe way you have the interest in this young man and if heif he sharpens up his act and get[s] all the positive reports over there, become[s] the leader that[to P.L.] who's in charge over there among you guys, you or [L.]?
[P.L.]: [L.]
THE COURT: Are you all roommates?
[P.L.]: Yes.
THE COURT: You are?
[P.L.]: Yes.
THE COURT: I didn't know that. You're not talking to me because you're his buddy, are you?
[P.L.]: Unh-unh. He all right with me.
THE COURT: He's all right with you?
[P.L.]: Yes.
THE COURT: Well, here's what I'm going to do. I'm going to restrict you until you're twenty-one, with the understanding between you and II [am not] talking *1127 about anybody else, understanding between you and I, if you come back to me and you're spit'n polished, you show me that you've changed your life, I'll cut this thing. Otherwise, I'm going to say you know, what with you. Do you understand that?
Neither W.T.L. nor his counsel was present during the judge's colloquy with P.L. on October 13. However, following further proceedings in appellant's transfer hearing on October 13 and 14, the judge told W.T.L.'s counsel that he hoped to learn what appellant's "attitude" was and then stated parenthetically: "As a matter of fact, perhaps not to your even knowing, there washis roommates[4] gave some insight on him, in another context. Were you in the courtroom?" A brief colloquy between the judge and appellant's counsel then ensued:
[APPELLANT'S COUNSEL GOODE]: No, your honor, but that was related to me.
THE COURT: Yes. Well, that happened, and so those are the kind of things I need to know about him.
All right?
[APPELLANT'S COUNSEL REISER]: Very well, your honor.
[APPELLANT'S COUNSEL GOODE]: Thank you.
THE COURT: All right.
The proceedings in appellant's hearing then adjourned until October 17 and concluded on October 18. After hearing testimony by appellant and argument by counsel, the judge issued detailed oral findings in support of his conclusion under D.C.Code § 16-2307(e) that there were not reasonable prospects of rehabilitating appellant before he reached 21 years of age. Assuming for purposes of the transfer hearing that appellant had committed the offenses with which he was charged,[5] and considering appellant's age, the nature of the offenses charged, appellant's prior record, his mental condition, past treatment efforts directed towards him, and the facilities and resources available for his rehabilitation, the judge found that he had "maximized" all the benefits available to him from the juvenile system and that further such services "would be cumulative at best."
On the long term basis, past residential treatment efforts proved ineffective on the respondent's violent criminal behavior. The respondent remains extremely violent and presents a danger to himself and this community. There are no reasonable prospects for rehabilitating the respondent in the juvenile system in light of the vicious attack on the witness after four years. Therefore, the Criminal Division's techniques, facilities and personnel are better suited to meet ... the needs of the respondent.

II.
Canon 3(A)(4) of the ABA Code of Judicial Conduct[6] provides in relevant part:
A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte or other communications on the merits or procedures affecting the merits of a pending or impending proceeding.
This court has had several opportunities to address the reach of Canon 3(A)(4) and when its breach occasions error requiring reversal and remand of a proceeding to another judicial officer. Foster v. United States, 615 A.2d 213 (D.C.1992); In re J.A., 601 A.2d 69 (D.C.1991); Belton v. United States, supra note 6; Davis v. United States, 567 A.2d 36 (D.C.1989); Sloan v. United States, 527 A.2d 1277 (D.C.1987). These cases invariably *1128 have involved circumstances where the trial judge received ex parte information, off the record and outside of normal court proceedings, that was significantly prejudicial to an appellant.[7] Moreover, in two of the cases warranting reversal, Belton and J.A., this court found an accompanying violation of Canon 3(C)(1) (requiring that a judge disqualify him- or herself in a proceeding in which the judge's impartiality might reasonably be questioned), and in J.A. the record reflected "a significant level of [judicial] bias" that tainted the proceedings. In re J.A., supra, 601 A.2d at 79.
In critical respects the case before us now is unlike others in which we have examined allegations of improper ex parte communications. The record here reflects that the trial judge apparently learned the ex parte information that came to his attention inadvertently, while engaged in an intense and conscientious effort, on the record and in open court, to communicate meaningfully with and influence an adjudicated delinquent in another case. In that case the trial judge unmistakably understood that the stakes were very high for both the respondent and the public since the judge had before him in P.L. a juvenile whose past conduct and psychological profile gave every indication that if he could not be rehabilitated, he would pose an extreme danger to the community when he was released. In exhorting P.L. to improvement, the judge suggested repeatedly that he emulate appellant's example.
Appellant asserts, nevertheless, that the trial judge not only initiated improper ex parte communications about him in the P.L. proceeding, but "considered the information in the course of making his decision on the transfer motion." Moreover, appellant claims that the judge violated Canon 3(C)(1) as well as 3(A)(4) because in the P.L. proceeding he gained personal knowledge of disputed evidentiary facts concerning appellant's proceeding. Appellant further argues that the information received by the trial judge during the P.L. proceeding was damaging to appellant, was important to the judge's decision, and that the judge's reliance on it is reflected in part by the circumstance that the prosecutor who was present during the P.L. proceeding argued in W.T.L.'s case that the judge should rely on it. Finally, appellant asserts that his counsel was deprived of the opportunity to effectively challenge the "negative" information the judge received.
Appellant's assertions are not supported by the record. The testimony before the trial judge at appellant's initial hearing, the exhaustive testimony at the transfer hearing, and the judge's thorough and careful findings lead inescapably to the conclusion that the nature of the offense with which appellant was charged was the dispositive factor influencing the judge's transfer decision, not anything the judge learnedor anything the prosecutor argued the judge learnedfrom P.L. about appellant. Indeed, appellant concedes as much in his brief, contending that the nature of the offense was "the critical and determining factor relied upon" by the trial judge in his decision to transfer appellant for adult prosecution. Moreover, there is no evidence in the record that the trial judge had "personal knowledge" of evidentiary facts against appellant that he failed to disclose, in violation of Canon 3(C)(1).
*1129 Nor was appellant's counsel denied the opportunity to challenge the information the trial judge learned during the disposition proceeding involving P.L. The judge alerted appellant's counsel that he had learned information during the P.L. proceeding about appellant. Without confronting or otherwise exhibiting any hostility to appellant or his counsel, the judge asked whether counsel had been in the courtroom at the time. When one of appellant's attorneys responded that she had not been present but that the information "had been related to" her, the judge stated again that it had "happened" and explained that the things that had been discussed included the "kind of things" he needed to know about appellant. Thereupon, appellant's other counsel simply stated, "very well, your honor." Neither appellant's counsel asked to pursue further the information the judge had received, either by seeking to explore the matter further with the judge, requesting a recess in the proceedings to order a transcript of the P.L. proceeding, or investigate it further by seeking through P.L.'s counsel to question P.L. The judge was advised only that counsel apparently knew what he had learned from P.L., i.e., it had "been related" to counsel, and must have assumed from counsel's acknowledgment ("very well, your honor") and subsequent silence that appellant had no wish to pursue the matter further.[8]
Furthermore, virtually all of the information received by the trial judge from P.L. about appellant was favorable to him and confirmed that he had benefitted from the various rehabilitation programs he had experienced since his initial commitment in 1990. The judge learned from P.L., inter alia, that appellant had tried to help P.L., had tried to keep him out of trouble, was trying to get P.L. and other boys "to do the right thing," and did not waste his time "messing" with those who are "constantly getting in trouble." Perhaps most significantly, in response to the judge's question whether appellant was "faking" him, P.L. responded in the negative, indicated that appellant was "programming," and in response to the judge's further inquiries about the meaning of "programming," stated it meant that appellant was "doing the right thing."
Consequently, while we regretfully conclude that the trial judge, apparently inadvertently, engaged in prohibited ex parte communications about appellant during his extended colloquy with P.L. in the judge's commendable effort to successfully engage P.L. during P.L.'s disposition hearing, we are satisfied that the technical violation of Canon 3(A)(4) which occurred was harmless, whether measured by the criminal harmless error standard or the special three-part harmless *1130 error test that we have applied to intemperate courtroom conduct reflecting bias.[9]Compare Davis, supra, 567 A.2d at 41 with Scott, supra, 559 A.2d at 747, adopting special harmless error test of Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 864, 108 S.Ct. 2194, 2204-05, 100 L.Ed.2d 855 (1988). Under Davis, there is no reason to believe that any information learned by the trial judge during P.L.'s disposition was motivated by a desire to obtain ex parte facts or that such information affected the judge's waiver determination under the statute.
Accordingly, because nothing in the record suggests that the trial judge's initiation of an ex parte communication ... either biased the trial judge's opinion or caused the trial judge to receive ex parte information that appellant had no opportunity to challenge, we conclude the trial judge's violation of Canon 3(A)(4) did not substantially prejudice appellant.
Foster, supra, 615 A.2d at 220.
Similarly, under the three-part Liljeberg test, we are satisfied, first, that the risk to appellant from the trial judge's ex parte communication was negligible where the communication elicited no prejudicial information about appellant and where the canon violation involved a juvenile waiver proceeding which, like a sentencing, is a "highly discretionary function of the trial judge" that permits the judge to "consider information from a wide variety of sources" in making a waiver decision. Second, we are persuaded that the risk of injustice to others is minimal in view of this court's prior admonitions against ex parte communications and our confidence that this opinion will alert trial judges to be wary that inquiries directed at resolving one proceeding should be limited so as not to elicit improper ex parte information about other pending or impending proceedings. Finally, we are convinced that the risk of undermining public confidence in the judicial process is insignificant here where the ex parte communication at issue took place on the record and in open court as part of an otherwise proper and conscientious effort by the trial judge to dispose of another case, and where there is no evidence of any bias on the part of the trial judge or any prejudice to appellant. Compare Foster, supra, 615 A.2d at 220-222.

III.
In Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), the Supreme Court held that the waiver of juvenile court jurisdiction is a critically important action that determines vitally important statutory rights of a juvenile accused of criminal conduct. Id. at 556, 86 S.Ct. at 1054-55. Consequently, a juvenile contesting transfer of a delinquency case for adult prosecution is entitled to a hearing, including the right to counsel, access by counsel to the juvenile's social and other relevant records, and a statement of reasons for the juvenile court's decision sufficient to permit meaningful scrutiny by a reviewing court.
We do not mean by this to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment.
Id. at 561-63, 86 S.Ct. at 1057.
Responsive to Kent, D.C.Code § 16-2304(a) (1989 Supp.) accords a child who is alleged to be delinquent the right to counsel "at all critical stages of Division proceedings," and § 16-2307 (1994 Supp.) provides in pertinent part:
(a) Within twenty-one days (excluding Sundays and legal holidays) of the filing of a delinquency petition, or later for good cause shown, and prior to a factfinding hearing on the petition, the Corporation Counsel may file a motion, supported by a statement of facts, requesting transfer of the child for criminal prosecution, if
(1) the child was fifteen or more years of age at the time of the conduct charged, and is alleged to have committed an act which would constitute a felony if committed by an adult; ...

*1131 (d) ... [T]he Division shall conduct a hearing on each transfer motion to determine whether to transfer the child for criminal prosecution.... The Division shall order the transfer if it determines that it is in the interest of the public welfare and protection of the public security and there are no reasonable prospects for rehabilitation. A statement of the Division's reasons for ordering the transfer shall accompany the transfer order. The Division's findings with respect to each of the factors set forth in subsection (e) of this section relating to the public welfare and protection of the public security shall be included in the statement....
(e) Evidence of the following factors shall be considered in determining whether there are reasonable prospects for rehabilitating a child prior to his majority and whether it is in the interest of the public welfare to transfer for criminal prosecution:
(1) the child's age;
(2) the nature of the offense and the extent and nature of the child's prior delinquency record;
(3) the child's mental condition;
(4) the child's response to past treatment efforts including whether the child has absconded from the legal custody of the Mayor or a juvenile institution; and
(5) the techniques, facilities, and personnel for rehabilitation available to the Division and to the court that would have jurisdiction after transfer.
(e-1) For purposes of the transfer hearing the Division shall assume that the child committed the delinquent act alleged.

(Emphasis added.)
During appellant's transfer hearing, the judge rejected the argument of appellant's counsel that the statutory presumption at such a hearing that appellant committed the offenses with which he was charged is inconsistent with the presumption of innocence. Consequently, he ruled, appellant had no right under the statute to "fact-finding" at a transfer hearing; rather, the sole purpose of such a hearing is to determine whether a juvenile respondent "can be rehabilitated by the services offered in the juvenile system."
Appellant argues that the "presumption of guilt" in D.C.Code § 16-2307(e-1) is unconstitutional, both on its face and as applied to him. He asserts that the presumption precludes him from challenging the government's evidence and introducing evidence on the nature of the offense. Moreover, he contends that under a "traditional due process analysis" he should be entitled to challenge the presumption of guilt because his interest in remaining within the juvenile system is "vitally important," the risk of erroneous deprivation of that right is high if the statutory presumption is permitted to stand, and the government can assert no valid interest in depriving him of the right to challenge its evidence against him. See Matthews v. Eldridge, 424 U.S. 319, 336, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Finally, he asserts that whether or not the statutory presumption renders the transfer statute unconstitutional on its face, it is unconstitutional as applied to him because it precluded him from challenging the single factor upon which the judge relied in granting the transfer requestthe nature of the offense with which he was charged.[10]
Two fundamental principles guide our analysis of this issue. First, a strong presumption of constitutionality inheres in legislative enactments, and there is a heavy burden on a party who seeks to overturn one. Cobb v. Bynum, 387 A.2d 1095, 1097 (D.C. 1978); United States v. Lowery, 382 A.2d 1007, 1009 (D.C.1977). As we have observed more recently,
A decent respect for the coordinate branches of government dictates that we exercise sparingly the power to strike down laws which have been duly passed by the elected representatives of the people. The Constitution presumes that even improvident *1132 legislative decisions will be rectified by the democratic process, and that "judicial intervention is generally unwarranted no matter how unwisely we may think that a political branch has acted." [Citation omitted.] The judiciary cannot encroach on the domain of the popularly elected branches without imperiling our most basic institutions. [Citation omitted.] Indeed, a court "usurps legislative functions when it presumes to adjudge a law void where the repugnancy between the law and the Constitution is not established beyond a reasonable doubt."
Hornstein v. Barry, 560 A.2d 530, 533 (D.C. 1989). Second,
[a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights. As a general rule, if there is no constitutional defect in the application of the statute to a litigant, he does not have standing to argue that it would be unconstitutional if applied to third parties in hypothetical situations.
County Court of Ulster County v. Allen, 442 U.S. 140, 154-55, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979).
Appellant falls short in meeting each of these burdens. First, there is no language in Kent requiring a probable cause determination that a juvenile is guilty of a criminal offense as a predicate to transfer of the juvenile for adult prosecution, and we are not persuaded that any constitutional due process requirement mandates such a hearing. United States ex rel. Bombacino v. Bensinger, 498 F.2d 875, 878 (7th Cir.1974). Our circuit court has held that a federal statutory presumption similar to that attacked by appellant "is not inconsistent with a juvenile's due process rights because the trial itself functions as a corrective for any reliance on inaccurate allegations made at the transfer stage." In re Sealed Case (Juvenile Transfer), 282 U.S.App.D.C. 156, 162, 893 F.2d 363, 369 (1990). See also In re Samuel M., 293 Md. 83, 441 A.2d 1072, 1078 (Md.Ct. Spec.App.1982) ("the waiver issue involves only a determination of which court will have jurisdiction over the juvenile for the purpose of deciding whether or not he has committed the acts alleged"). Moreover, while acknowledging Kent's establishment of the "possibility of transfer from juvenile court to a court of general jurisdiction" as a matter of "great significance" for a juvenile, the Supreme Court indicated a decade after Kent that the fulcrum of the transfer determination should lie in an assessment of whether the youthful offender can "benefit from the specialized guidance and treatment contemplated by the [juvenile] system." Breed v. Jones, 421 U.S. 519, 535, 95 S.Ct. 1779, 1789, 44 L.Ed.2d 346 (1975). Significantly, by noting that the procedures of a jurisdiction might or might not provide that "evidence concerning the alleged offense" is relevant to the transfer decision, the Court in Breed strongly implies that there is no constitutional right to present such evidence. Breed, supra at 536, 95 S.Ct. at 1789.
Second, even were we to accept appellant's argument that under a "traditional due process analysis" a probable cause hearing is a constitutional predicate to a valid transfer determination, appellant in fact received such a hearing here when Officer Battle testified at his initial hearing and appellant, represented by counsel, was afforded the opportunity to confront and, if he chose, to contest the evidence against him. Appellant's complaint that his initial hearing could not adequately substitute for a right to revisit the issue of probable cause at the transfer hearing because he had little time to prepare for the initial hearing and no notice that a transfer eventually would be requested is unpersuasive where appellant was represented by counsel at the initial hearing, never sought a continuance to further investigate the case or to interview or subpoena witnesses, and never sought to reopen the hearing based on the government's alleged failure to disclose information that allegedly would have negated probable cause. Thus, even were appellant entitled to a probable cause determination before he could be transferred for prosecution as an adult, surely "there is no constitutional requirement that a probable cause *1133 showing must be made twice." Bombacino, supra at 878.[11]

IV.
For the foregoing reasons, the order appealed from is hereby
Affirmed.
NOTES
[*] Sitting by designation pursuant to D.C.Code § 11-707(a) (1989).
[1] Appellant was adjudicated a delinquent in that trial and was committed until April, 1994.
[2] Appellant had come from a household with a history of neglect. His mother had a serious drug problem, was HIV positive, and essentially had not been involved in his life. Appellant had been cared for primarily by a grandmother who cared for other siblings as well, several of whom were involved in court proceedings.
[3] We have included here the entirety of the trial judge's references to W.T.L. in the P.L. proceeding so as to convey as fully and clearly as possible the nature and content of the information received by the trial judge from P.L.
[4] While the judge referred to "roommates" in the plural, the record does not reflect that the judge spoke with anyone other than P.L. about appellant.
[5] See D.C.Code § 16-2307(e-1) (1994).
[6] Currently, the ABA Code of Judicial Conduct governs the conduct of judges of the District of Columbia Courts. Belton v. United States, 581 A.2d 1205, 1213 n. 8 (D.C.1990). Effective June 1, 1995, these judges will be governed by the Code of Judicial Conduct for the District of Columbia Courts.
[7] In Foster, the trial judge telephoned a Parole Board member about the purported inconsistency of the Board's recommendation that appellant be sentenced as a youth offender, apparently leading to a subsequent change in the Board's position and a recommendation for an adult sentence. In J.A., the trial judge telephoned a probation officer and reviewed a divorce file while adjudicating a neglect complaint, and thereafter engaged in aggressive, hostile questioning regarding the lifestyles of women in the children's home. In Belton, the judge learned significant adverse information about a defendant whose sentence was pending before him as a consequence of speaking with persons who lived in a residential area and who told the judge the defendant made their lives miserable. The trial judge in Davis initiated his own out-of-court telephone investigation of the defendant's credibility during a lunch hour recess in a jury trial and permitted the government to reopen its cross-examination of the accused to elicit the prejudicial information. In Sloan, the trial judge learned of a communication between a juror and the judge's law clerk after a split verdict had been returnedbut before the defendant was sentencedreflecting that the jury acquitted the defendant on some counts only because jurors misunderstood the judge's instructions.
[8] This court has had occasion to note in a different context that where a defendant and counsel at the defendant's sentencing proceeding are suddenly confronted "without explanation by a comment about an ex parte contact highly critical of the defendant," it may be expecting too much to impose on the defendant the burden to "question... the judge's ethics just before sentence [is] pronounced." Belton v. United States, supra, 581 A.2d at 1212 n. 7. See also Scott v. United States, 559 A.2d 745, 755 (D.C.1989) (inappropriateness of placing on a criminal defendant the burden of attacking a judge's integrity); In re J.A., supra, 601 A.2d at 75 n. 5 (where "ex parte contacts are an alleged source of bias, the court has already decided that it will apply a harmless error test in the absence of objection during trial").

However, that an objection may not be required in response to a judge's eliciting of ex parte information does not establish, a fortiori, that any time such an action occurs an affected party automatically has been deprived of the opportunity to effectively challenge it. Where a trial judge alerts a party in a non-confrontational manner that the judge has learned information about the party in a different proceeding, explains that the information may have significance, and there is nothing in the record reflecting that the information was critical of the party or that it was conveyed with hostility by the judge, it strains credulity to assert that counsel for the party was precluded from challenging the information the judge received. Moreover, under such circumstances it is questionable whether counsel is faced with the Belton dilemma of challenging the judge's ethical conduct or integrity in order to pursue the matter further. Where counsel thereafter conveys to the judge an awareness of the information and takes no steps to pursue it further, the judge reasonably may assume that counsel does not wish to pursue it, particularly in circumstances where, as here, the judge knows that the information he learned was wholly favorable to the party. "One of the reasons for requiring immediate objection at the trial court level is that such objection makes it possible for remedial measures to be taken." Hopkins v. United States, 595 A.2d 995, 996 n. 3 (D.C.1991).
[9] Of course, by alluding to the latter standard we do not mean to suggest that the record here reflects conduct by the trial judge that was either intemperate or biased. It does not.
[10] In fact, the record does not reflect that appellant either sought to challenge or was prohibited from challenging the "nature of the offense" with which he was charged; indeed, the judge indicated that that would be among the factors considered at the transfer hearing. Rather, appellant sought to contest whether he committed the offense, and the judge precluded him from doing so.
[11] Indeed, appellant will receive at least a second probable cause determination before he can be prosecuted as an adult for the offenses with which he is charged since indictment by a grand jury will be a prerequisite to his prosecution for any adult felony offense. Moreover, in the event appellant is transferred for prosecution as an adult and presented before the Superior Court before he is indicted, he will be entitled to yet another hearing to determine whether probable cause exists to hold him for the action of the grand jury. See Super.Ct.Crim.R. 5.