**Johnny L. HARRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 93–CF–648, 98–CO–392.**

District of Columbia Court of Appeals.

Argued March 11, 1999.
Decided Sept. 16, 1999.

---

Before FARRELL and RUIZ, Associate Judges, and BELSON, Senior Judge.

RUIZ, Associate Judge:

This appeal raises a timely issue about the rights of criminal defendants in the context of judicial efforts to improve the jury system by soliciting jurors' views at the conclusion of their jury service, but while aspects of the case are still pending before the trial judge.

## I.

Appellant Johnny Harris was charged in a three-count indictment with first-degree murder while armed, D.C.Code §§ 22–2401, –3202 (1996), possession of a firearm during the commission of a crime of violence (PFCV), D.C.Code § 22–3204(b), and carrying a pistol without a license (CPWL), D.C.Code § 22–3204(a). After a jury trial, Harris was convicted of the lesser-included offense of second-degree murder while armed, and of the gun charges. Harris was sentenced on May 5, 1993, to serve consecutive terms of fifteen to forty-five years' incarceration for the second-degree murder while armed conviction, five to fifteen years' incarceration for PFCV, and one year of incarceration for CPWL. Subsequently, Harris filed a motion for a new trial pursuant to D.C.Code § 23–110 based on newly discovered evidence and ineffective assistance of counsel which was denied without a hearing on January 28, 1998. Harris filed timely notices of appeal from both his convictions and the denial of his § 23–110 motion, and we consolidated the cases for the purposes of this appeal.

On appeal, Harris asserts trial court error in (1) the denial of his motion to suppress statements made to Metropolitan Police Department detectives, alleging that the detectives entered his apartment without his consent, and in the alternative, that the statements were involuntary, made only after the police had threatened him with arrest; (2) the refusal to recuse itself in the sentencing phase after the court

Richard S. Stolker, Rockville, MD, for appellant.

Karen L. Melnik, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Mary–Patrice Brown and J. Edward Agee, Assistant United States Attorneys, were on the brief, for appellee.

initiated an *ex parte* communication with the jurors; and (3) the failure to conduct a § 23–110 evidentiary hearing during which time he could have presented evidence of his counsel's failure to fully and adequately investigate the case. Finding merit only to his second claim, we affirm the convictions after concluding that the trial court's improper *ex parte* contact with the jurors was harmless.

### Factual Background.

According to the government witnesses, just after two o'clock in the afternoon on December 20, 1991, three teenagers exited a bus at a stop near the 2300 block of Minnesota Avenue, S.E. One of them left the area while the other two, appellant Harris and Damon Williams, remained. Harris spoke to Williams while the latter listened, hunching his shoulders with his hands on both sides of his back. Suddenly, Harris pulled out a gun with his right hand and aimed the barrel at Williams' temple before shooting him in the head. At no time before Harris pulled out his gun was Williams seen reaching towards his waistband or his coat pocket. After he shot Williams, Harris ran off in the direction of Pennsylvania Avenue.

William Hudson, a D.C. firefighter and emergency medical technician, stopped to administer CPR to Williams after driving by and seeing Williams laying on the ground near the bus stop. Hudson did not see any weapons in Williams' waistband area or on the ground. An autopsy of Williams' body revealed that the bullet which had killed him had entered the left side of the scalp and continued through the brain to the soft tissue on the right side of the scalp.

About three months after the shooting, on April 10, 1992, Detectives William Porter, Joseph Fox, Jeffrey Mayberry, and Victor Smith, all from the Metropolitan Police Department, went to Harris' apartment in order to speak with Harris about

the murder.[1] The detectives pressed the buzzer for Harris' apartment and were let into Harris' building and unit. Harris was not placed under arrest, but accompanied the officers back to the police station. After Detective Porter had reviewed a PD–47 "rights card" containing the *Miranda* warnings, Harris signed the card and proceeded to discuss the shooting with Detective Porter for the next forty minutes, agreeing to give a videotaped statement. In the statement, Harris admitted that he shot Damon Williams, but claimed that he did so in self-defense. Harris stated that they had been feuding over drug territory a few weeks before the incident, and that he had been carrying a gun in his right coat pocket for protection. Just before Harris shot Williams, Williams had "reached into his pants and said, 'What's up now, bitch nigger?'" Harris then reached into his right coat pocket, pulled out his gun and shot Williams on the side of the head in self-defense. After shooting Williams, Harris went home, but sometime later went out again and threw the gun into the Potomac River.

### II.

Harris asserts that the warrantless police entry both into his apartment building as well as into his apartment unit violated his Fourth Amendment rights because the police did not have the requisite consent to enter either one. Consequently, he argues that his later statements given at the homicide office should have been suppressed as fruits of an illegal search. In the alternative, Harris argues that the statements should be suppressed because they were made involuntarily after Harris was threatened with arrest and told that he would be allowed to go home only if he made a statement. We reject these contentions because Harris was neither seized in his apartment nor in custody when he

---

1. The detectives learned of Harris' whereabouts after speaking to his brother, Antoewn. Detective Fox first spoke to Antoewn about Harris' possible involvement in the murder in January 1992.

went to the homicide office, and his statements were not the result of coercion

## A.

The trial court denied Harris' pretrial motion to suppress after crediting the MPD detectives' testimony that they had entered his apartment after someone had invited them in,[2] and that Harris had gone to the station on his own accord[3] after being told that the detectives wanted to question him about the Williams shooting. The court found that when the detectives arrived at Harris' apartment building, "the detectives gained entry to the building by peaceful means. There is no evidence that they broke a lock to get in, no evidence that there was any type of forced entry. They were either buzzed or let in." Once invited into the apartment by a "heavy-set woman,"[4] the detectives found Harris and indicated to him that they wanted to question him about the shooting. Harris then "voluntarily accepted the detectives' invitation to go speak with them." The trial court credited the detectives' testimony that Harris had not been frisked or handcuffed, either in the apartment or during his trip to the homicide office.[5] In short, the court concluded that at no point during the entire incident, from the detectives' arrival at Harris's apartment to the questioning at the police station was Harris "ever in custody. It was clear to him from the beginning that he was not under arrest, and it was clear to him from the beginning that he was going to be taken back home after this process had finished."

With respect to Harris' statements to the detectives,[6] the court found that at any

> The Court specifically does not believe that Mr. Harris was in any way handcuffed. The Court does not believe that he was put up against the wall and searched. The Court believes, based on the testimony it has heard, that Mr. Johnny Harris agreed to go with the police officers to speak about this matter[,] perhaps having faith in his ability to talk his way around the situation that was being investigated.

2. Detective Porter testified that the detectives were admitted to the building by means of a buzzer system, while Detective Fox stated that "somebody went in the building [and] opened up the front door, which is a security type door." Once inside the building, the detectives proceeded to Harris' apartment, knocked on the door and were let in by a young woman.

3. Detective Victor Smith described Harris as being "very cooperative in terms of the investigation." Detective Jeffrey Mayberry testified on rebuttal that Harris responded that "he had no problem with it" after he was asked whether he would come downtown with them and answer some questions about the murder. Detectives Porter and Mayberry testified that Harris was not handcuffed; frisked, searched, or formally arrested at any time. In contrast, Harris testified that after he denied possessing any knowledge about the shooting, the detectives told him to accompany them back to the homicide office, "put [him] against the closet, ... frisked [him], took [his] keys out of [his] pocket and handcuffed [him] and then they escorted [him] out to the car." Appellant's brother, Antoewn, also confirmed that appellant was led out of the apartment in handcuffs.

4. The court found that "there was no reason for the detectives to not believe, and properly so, that they had been at least invited into the room beyond that door."

5. The court stated:

6. Detective Smith testified that as he drove Harris to the homicide office, "[t]here may have been some casual conversation, [but] there was nothing directly related to the case." Upon arrival at the homicide office, Harris was taken to a cubicle area, where Detective Porter told him that he was not under arrest, crossing out the reference to arrest on the PD–47 card. The detective then read out each question on the card, verifying that Harris understood each question, and Harris placed his initials next to each of the four questions on the back of the rights card. Harris eventually agreed to give a videotaped statement in which he admitted killing Williams in self-defense. In contrast, Harris testified that while en route to the station, Detectives Porter and Mayberry questioned him about the murder. Once they arrived at the homicide office, the detectives handcuffed Harris to a chair, and for the next ten to fifteen minutes, Detective Porter asked Harris about the homicide. Though Harris initially denied any involvement in the killing, he eventually admitted shooting Williams "[b]ecause [the detectives] told me they was going

point Harris "could have stopped the process. He could have refused to be video-taped. He could have refused to answer any questions. He could have said that he wanted to go home. But for reasons which are his alone, he decided to give that version that sounds in self-defense." Moreover, even though the police had not been required to give Harris *Miranda* warnings as he was not in custody, the court concluded that he had nevertheless been read his rights, and indicated that he understood those rights. Consequently, Harris' "statements were made voluntarily, knowingly, and of his own free will, and they were not made as a part of custodial interrogation."

## B.

■ This court's scope of review of a trial court's denial of a motion to suppress evidence is a limited one. We must defer to the trial judge's findings of fact, and accept his resolution of conflicting testimony. *See Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989) (citing cases). Moreover, we will not disturb the judge's factual findings unless they are clearly erroneous, or without substantial support in the record. *See id.* (citing *United States v. Alexander,* 428 A.2d 42, 49–50 (D.C.1981)). Nevertheless, as the ultimate determination of whether a seizure occurred is a question of law, we independently review the trial court's conclusion. *See id.* (citing *Richardson v. United States,* 520 A.2d 692, 696 (D.C.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 267, 98 L.Ed.2d 224 (1987)).

We conclude that the trial court did not err in denying Harris' motion to suppress. First, whether the detectives entered Harris' apartment building or unit without his consent is irrelevant to our determination of whether Harris' statements should have been suppressed because the statements were not obtained from the exploitation of an illegal entry into Harris' building or unit. *Cf. Martin v. United States,* 605 A.2d 934, 938 (D.C.1992), *cert. denied,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992) (citing *New York v. Harris,* 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990)) (finding statement admissible even if police had entered defendant's grandmother's house without consent, but with probable cause for defendant's arrest, where statement not obtained as a result of the exploitation of the illegal entry).[7] Second, even though the trial court did not address the issue, the testimony credited by the trial court makes it clear that Harris was not "seized" for Fourth Amendment purposes. Third, there was sufficient evidence in the record to support the trial court's determination that Harris was never in custody, and instead, went with the detectives to the station voluntarily, where he waived his rights. Thus, he was never subjected to unwarned custodial interrogation in violation of the Fifth Amendment.

■ The trial court found that Harris was not in custody. Seizure and custody, however, are not the same thing. *See Morris v. United States,* 728 A.2d 1210, 1216 (D.C.1999). An individual is " 'seized' within the meaning of the Fourth Amend-

to let me go home. That was the only reason." Harris also stated that the detectives told him that if he did not give a videotaped statement, he "would be locked up for the rest of [his] life."

7. Nevertheless, the evidence in the record supported the court's conclusion that there was either actual or apparent authority to enter Harris' building and unit. As the court noted, after crediting the detectives' testimony, "[t]here is no evidence that they broke a lock to get in [to the apartment building], no

evidence that there was any type of forced entry. They were either buzzed or let in." Once inside the building, the court found that the detectives were let in by a "heavy-set woman" and that the detectives had no reason to believe that they had not been at least invited into the living room. *See Wright v. United States,* 717 A.2d 304, 306 n. 2 (D.C. 1998) (citing *Illinois v. Rodriguez,* 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)) (recognizing doctrine of apparent authority).

ment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The test is an objective one, which focuses on a reasonable person's interpretation of the conduct in question, and allows the police to determine in advance whether their contemplated conduct will implicate the Fourth Amendment. *See Lawrence, supra,* 566 A.2d at 60 (citing *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). Here, the evidence in the record credited by the trial court establishes that appellant was not seized. Both Detectives Porter and Mayberry testified that they did not arrest Harris, nor handcuff, frisk or search him at his apartment or at any time prior to taking him to the homicide office. Detective Smith testified that Harris was "very cooperative" when asked to accompany the detectives to the homicide office to answer questions regarding Williams' murder. Detective Smith also testified that Harris rode to the station unrestrained in the front seat of the detective's cruiser. Finally, as they had promised, the police drove Harris home after the interview was complete. Based on the detectives' testimony, which the trial court credited, and the court's findings of fact, which were not clearly erroneous, we conclude that Harris was not seized when the detectives entered his apartment. As there was no search [8] or seizure, the Fourth Amendment is not implicated.

■ Custody, possibly implicating Fifth Amendment concerns, requires more than a seizure. *See Morris, supra,* 728 A.2d at 1216 (noting that interrogation is custodial " 'only in those cases in which there has been a formal arrest or restraint on freedom of movement of the degree associated with formal arrest' ") (quoting *In re E.A.H.,* 612 A.2d 836, 838 (D.C. 1992)). We conclude, as did the trial court, that Harris was not in custody when he was brought to the police station. Because Harris was not in custody and, as the court found, free to leave at any point, his Fifth Amendment claim that his statements were involuntary as a matter of law is without merit. The procedural safeguards of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are implicated only when a person is involved in custodial questioning or its "functional equivalent," *i.e.* "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject." *Spann v. United States,* 551 A.2d 1347, 1349 (D.C. 1988) (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). Moreover, as the trial court noted, Detective Porter, though not required to do so, read Harris his *Miranda* rights and asked him to place his initials next to each right to indicate that he understood it.

Finally, there is no evidence to support a claim that Harris' statements were coerced, given the court's discrediting of Harris' testimony that the detectives made threats and promises to compel his confession. *See Hebron v. United States,* 625 A.2d 884, 885 (D.C.1993) (trial court's factual findings underlying conclusion of voluntariness not disturbed on appeal unless

---

8. We conclude that there was no search of the apartment which would have triggered Fourth Amendment concerns, as the trial court credited the detectives' testimony that they were "at least invited into the [living] room beyond [the front apartment] door[,]" see *supra* note 7, and both appellant and his brother, Antoewn, testified that appellant walked into the living room from an adjoining bedroom upon hearing the detectives' voices in the next room. *Cf. Coates v. United States,* 134 U.S.App. D.C. 97, 99, 413 F.2d 371, 373 (1969) (noting that it is "well established that visual detection of evidence does not constitute a 'search' within the meaning of the Fourth Amendment").

findings are without substantial support in the record).[9]

### III.

■ Harris further argues that this case should be remanded for re-sentencing because the trial court initiated and engaged in prohibited *ex parte* communications with jurors after they had rendered a verdict, and then considered and relied upon these communications in its determination of Harris' sentence, in violation of the ABA Code of Judicial Conduct. Although we agree that the trial judge engaged in improper *ex parte* communications about the proceeding in violation of Canon 3(A)(4), we are satisfied that the violation was harmless.

### A.

After the jury had rendered its verdict, Judge Dixon in open court invited the jurors to come speak with him in the jury room if they had any questions or concerns they wanted to raise about the process they had just gone through, stating:

> [I]f for any reason there is any question that any of you have that you would like to ask me or if there's anything you'd like to tell me or if you'd like to complain about the waiting time or complain about the lack of amenities in the jury room or anything that you wish to see me about, I'll make myself available to you in a few moments in the jury room,

if you have any reason you want to talk to me.

> Sometimes jurors have questions I can answer, and I will, and sometimes they have questions that I can't answer because they're either inappropriate or I don't know the answer. In those cases, I'll tell you it's not appropriate for me to answer or I don't know the answer.

> If you have no reason to see me, you don't have to wait. It will only be me, and I'm making myself available because in the past, we've been told by jurors, "I wish I had a chance to tell the Judge some particular matter before departing." So if you'd like to wait about two or three minutes in the jury room, and I'll make myself available to you.[10]

Subsequently, at sentencing on May 5, 1993, following allocution and before the court imposed sentence, Judge Dixon advised the parties that although he had reached his own conclusions after and during the course of the trial, he thought it would be helpful to relate to both counsel the substance of his post-trial discussions with the jurors. Judge Dixon informed counsel that he had been told that, from the beginning of deliberations, one juror had declared to the others that under no circumstances would he ever return a verdict of first-degree murder, which effectively had left the jury with the choice of being hung or returning some other type

---

**9.** We find no merit to appellant's related claim that the trial court erred in denying him a hearing on his § 23–110 motion alleging that his counsel was ineffective because he did not make an on-site inspection of Harris' apartment building or interview prospective witnesses in order to rebut the detectives' testimony that they entered the building with consent. In particular, Harris asserts that had counsel conducted the proper investigation, he would have learned that Harris' building had no buzzer system, and discovered two witnesses who would have testified that they did not hear any knocking on Harris' front door and observed Harris being led away in handcuffs by the police. However, as Harris did not identify any of these witnesses or provide any affidavits to support either of

his contentions, and still has not done so before this court, his claim is vague and conclusory, and the trial court acted properly in denying his motion without a hearing. *See Fields v. United States,* 698 A.2d 485, 489 (D.C.) (affirming summary denial of § 23–110 motion because appellant's failure to provide affidavits from any of the alleged witnesses was "itself a sufficient ground to reject without a hearing allegations of ineffectiveness premised on the failure to call them"), *cert. denied,* —— U.S. ——, 118 S.Ct. 1203, 140 L.Ed.2d 331 (1998); *Reaves v. United States,* 694 A.2d 52, 57 n. 6 (D.C.1997).

**10.** Counsel for appellant did not object to Judge Dixon's invitation to the jury.

of a verdict.[11] Given those options, and not wanting Harris back on the street, the jury informed Judge Dixon at the post-verdict meeting, they had compromised on the lesser-included offense of second-degree murder. Judge Dixon then opined to counsel that he had not been surprised that a number of jurors favored conviction for first-degree murder as "the evidence supported the fact that this was just an unfortunate, cold-blooded killing."

Judge Dixon made clear prior to imposing sentence that he based his sentencing decision on what *he* considered to be the tragic circumstances of the killing, commenting:

> [I]t is really disappointing to see what has happened to the young men in our community, how this attitude of machoism has gotten to the point of an extreme whereby the retaliation for any type of infraction is to an [sic] assault them with a firearm. And that's what you did. On your way to the school you got into this argument on a bus, stepped off the bus and put a gun to that young man's head, waited at least a second or two and then pulled the trigger, not considering what the consequences were going to be to you or the young man. It's—It's really unfortunate, Mr. Harris.

Based on the court's comments, Harris moved for recusal, arguing that the court's conversation with the jurors had affected its sentencing decision and that it at least created the appearance of impropriety. In response, Judge Dixon emphatically stated: "No, sir. No, sir; it has not affected my decision making." Judge Dixon assured both counsel that he would not consider the contact as he made his sentencing deliberations, emphasizing that the conversation with the jurors had "not affected [his] decision making." He then denied Harris' motion for recusal and imposed sentence.

## B.

■ Canon 3(A)(4) of the ABA Model Code of Judicial Conduct provides in relevant part:

> A judge should accord to every person who is legally interested in a proceeding, or his [or her] lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.[12]

*Ex parte* communications are "those that involve fewer than all of the parties who are legally entitled to be present during the discussion of any matter" and are prohibited in order to "ensure that 'every person who is legally interested in a proceeding [is given the] full right to be heard according to law.'" JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS 149 (2d ed.1995) (quoting ABA MODEL CODE OF JUDICIAL CONDUCT Canon 3 A(4) (1972)).[13]

In addition, Canon 3(C)(1) of the ABA Model Code of Judicial Conduct requires judges to disqualify themselves from a

**11.** Judge Dixon was told about the juror's statement and its implications for the jury's deliberations after asking the jurors to clarify what they had meant when they asked him what should be done "if a juror won't follow the law."

**12.** Thus, by its own terms, Canon 3(A)(4) prohibits both (1) initiating *ex parte* communications and (2) considering such communications in rendering a decision. *See Foster v. United States,* 615 A.2d 213, 216 (D.C.1992).

**13.** We have treated situations in which a trial court has received *ex parte* communications where no interested party was present in the same manner as those cases where the communication was received "at the instance and for the benefit of one party only." BLACK'S LAW DICTIONARY 576 (6th ed.1990) (characterizing a judicial proceeding, order, and the like, as being *ex parte* "when it is taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by, any person adversely interested"). *See, e.g., In re W.T.L.,* 656 A.2d 1123 (D.C. 1995) (concluding that trial judge's receipt of *ex parte* information about appellant during unrelated court proceedings involving another juvenile, though in violation of Canon 3(A)(4), was harmless).

proceeding in which their impartiality "might reasonably be questioned." [14] These prohibitions together serve "to prevent the 'actual or apparent partiality [which] undermines the confidence in the judiciary ... essential to the successful functioning of our democratic form of government.'" *Foster, supra* note 12, 615 A.2d at 216 (quoting *Belton v. United States,* 581 A.2d 1205, 1214 (D.C.1990) (internal quotations omitted)).[15]

When Judge Dixon made his invitation to the jurors to communicate any questions or concerns they might have had about their jury experience following the rendering of the verdict, he did so in open court and without objection from either counsel. Judge Dixon's invitation to the jurors was for the purpose of seeking input from jurors about potential areas of improvement in the court system. However, despite his caveat to the jurors that there might be some questions which he could not appropriately answer, during his subsequent meeting with the jurors, conducted out of the presence of both Harris and his attorney, Judge Dixon nevertheless learned that one juror had indicated early on in the deliberations that he would not return a verdict for first-degree murder while armed, and that the jurors had reached a compromise verdict for second-degree murder while armed because they had not wanted Harris to go free. Accord-

ingly, while it is clear from the record that Judge Dixon did not intend to elicit substantive comments about the jury's deliberations and, indeed, cautioned the jury that it would be inappropriate for him to address some of their concerns, we are constrained to conclude that, despite his good intentions, the judge inadvertently initiated and subsequently engaged in prohibited *ex parte* communications about Harris' pending case during his post-verdict meeting with the jurors, thereby violating Canon 3(A)(4). *Cf. In re W.T.L., supra* note 13, 656 A.2d at 1129 (concluding that trial judge engaged in improper *ex parte* communications about appellant during his "commendable" attempt to engage juvenile during juvenile's disposition hearing).

We do not mean to imply that trial court judges should cease their efforts to provide an opportunity for jurors to talk to the court about matters which might have arisen during the course of trial. That opportunity could be a welcome one to jurors at the conclusion of what might have been a stressful experience and, equally important, it may provide useful and appropriate information about ways to improve the jury service experience. *See, e.g.,* COUNCIL FOR COURT EXCELLENCE, JURIES FOR THE YEAR 2000 AND BEYOND: PROPOSALS TO IMPROVE THE JURY SYSTEM IN WASHINGTON, D.C. 73 (1998).[16] Judicial efforts to solicit jurors' views are salutary and are to be

---

**14.** The text of Canon 3(C)(1) reads in pertinent part:

> A judge should disqualify himself [or herself] in a proceeding in which his [or her] impartiality might reasonably be questioned.

**15.** At the time of Harris' sentencing, the ABA Model Code of Judicial Conduct ("ABA Code") applied to District of Columbia judges. *See, e.g., Belton, supra,* 581 A.2d at 1213 n. 8. As of June 1, 1995, judges of the District of Columbia courts became governed by the Code of Judicial Conduct for the District of Columbia Courts ("D.C. Code"). *See In re W.T.L., supra* note 13, 656 A.2d at 1127. The new code is modeled primarily after the ABA's 1990 Model Code of Judicial Conduct. *See* CODE OF JUDICIAL CONDUCT v (1995). Many of the canons contained in the ABA Code can

be found in the D.C. Code. For example, Canon 3(B)(7) of the ABA Code is now Canon 3(B)(7) of the D.C.Code, while the principles contained in Canon 3(C)(1) of the ABA Code can now be found in Canon 2(A) of the D.C.Code.

Canon 3(B)(7) of the D.C.Code now permits certain *ex parte* communications in order to facilitate scheduling and other administrative purposes and to accommodate emergencies. Nevertheless, judges are still expected to discourage *ex parte* communication in most cases. *See id.* Canon 3(B)(7) cmt.

**16.** JURIES FOR THE YEAR 2000 AND BEYOND is a report of the Council for Court Excellence recommending jury reforms for the courts in the District of Columbia. Of relevance to the issue before the court in this appeal are Recommendation 16, *id.* at 19 ("The D.C. Jury

commended—provided they are made subject to certain procedural safeguards to avoid and, if necessary, mitigate, unanticipated disclosures such as the one that occurred in this case.

In 1996, the American Bar Association issued new Criminal Justice Standards to help resolve important issues relating to various aspects of criminal jury trials. *See* ABA STANDARDS FOR CRIMINAL JUSTICE DISCOVERY AND TRIAL BY JURY 119 (3d ed.1996).[17] In an effort to accommodate the rights of criminal defendants to be present at each important stage of the proceedings without deterring court systems' efforts to improve the jury experience, the ABA has recommended that any discussions between a court and the jurors following the conclusion of trial and the completion of the jurors' service be conducted "only on the record and in open court with counsel having the opportunity to be present." *Id.* at 227 (Standard 15–4.3. Judicial communication with jurors). *See also id.* at 228 (noting in the commentary for Standard 15–4.3 that the failure to hold communications with jurors "in open court, on the record, with counsel given the opportunity to be heard prior to the communication" deprives the defendant of the constitutional right to be present at all stages of the trial); *id.* at 230 (stating that

it is "permissible for the judge to converse with jurors about aspects of their jury service which did not bear upon the merits of the case"). *Cf. Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), and *Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (recognizing a criminal defendant's right to be present "at all critical stages of the trial"). We consider the ABA's recommendation to be a sound approach, one which adequately safeguards the rights of criminal defendants while continuing to encourage our court system's ongoing efforts to address the needs and concerns of jurors. While we cannot say for certain that the information about the jury's deliberations in Harris' case would not have been divulged had the discussion been conducted in open court and on the record, as recommended by the ABA standards, a transcript of the dialogue would provide a firm basis for counsel's evaluation and appellate review. In addition, the presence of appellant and his counsel would have afforded appellant the opportunity to cut off the discussion as soon as possible to limit any potential prejudice.[18]

### C.

▮▮▮ Although Judge Dixon violated Canon 3(A)(4) when he conducted the post-

---

Project recommends that the courts continue to regularly seek the feedback of jurors and that the results of any surveys/questionnaires utilized be tallied and reviewed by judges, jury administrators, and court policy makers."); and Recommendation 32, *id.* at 73 ("The D.C. Jury Project encourages trial judges to join jurors at the close of a trial in order to personally and informally thank them for their service, to answer questions about the court and jury systems, and to provide assistance for any juror who may have experienced extreme stress caused by the trial.").

**17.** The ABA's House of Delegates approved the new standards in August 1993, almost five months after the trial, and three months after sentencing in this case.

**18.** The D.C. Jury Project encourages trial judges, after jurors are discharged, to "provide additional opportunity for jurors who express a need to relieve tension by meeting

personally in a more informal setting and receiving comments about their experience." *See* JURIES FOR THE YEAR 2000 AND BEYOND, *supra,* at 73. This is what Judge Dixon did in this case. In such a setting it could be awkward for the judge to cut off a question or comment that appears to be heading in an inappropriate direction. Counsel could helpfully provide assistance without concern about prejudicing the defendant, as the jury already has returned a verdict.

There also are other ways to solicit juror input, which require their own safeguards. The Federal Judicial Center recommends that judges solicit information and suggestions pertaining to the juror experience through the use of an exit questionnaire. *See* ABA STANDARDS FOR CRIMINAL DISCOVERY AND TRIAL BY JURY, *supra,* at 230 n. 15; *see also* JURIES FOR THE YEAR 2000 AND BEYOND, *supra,* at 19 (Recommendation 16, see *supra* note 16).

verdict session with the jurors out of Harris' presence,[19] we are satisfied that this violation did not substantially prejudice Harris, and was therefore harmless. *See Davis v. United States*, 567 A.2d 36, 41 (D.C.1989) (finding harm where trial court initiated an investigation which "substantially prejudiced the defense").[20] There is no indication from the record that Judge

Dixon's decision to invite the jurors to speak with him at the conclusion of their service was motivated by his desire to obtain *ex parte* facts, as Judge Dixon explained that he had invited the jurors to meet with him because in the past "we've been told by jurors, 'I wish I had a chance to tell the Judge some particular matter before departing.'" Judge Dixon express-

**19.** Despite our conclusion that Judge Dixon engaged in an improper *ex parte* communication, we do not think that this conversation would have led an objective person to reasonably infer partiality, and therefore conclude that there was no violation of Canon 3(C)(1). *See Foster, supra* note 12, 615 A.2d at 219; *Belton, supra*, 581 A.2d at 1214 (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 861, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)). *Cf. Sloan v. United States*, 527 A.2d 1277, 1287 (D.C.1987) (recognizing that "an appearance or perception of impropriety can be damaging to public confidence in our judicial system, even though no violation of rights has occurred"). As discussed above, Judge Dixon immediately and emphatically denied Harris' allegations that the *ex parte* communication had affected his decision making or had given the appearance of impropriety. Moreover, the judge emphasized that "the evidence supported the fact that this was just an unfortunate, cold blooded killing" and discussed what he found to be the tragic circumstances of the murder, thereby indicating that the jurors had not given him any information that was not already known to him as a result of evidence presented over the course of the trial. *Cf. Foster, supra* note 12, 615 A.2d at 217 (no indication that member of Parole Board communicated any information to trial judge about appellant not already available through other sentencing reports). Finally, although it would have been preferable for the judge to have apprised counsel about the communication at the start of the sentencing hearing, he nevertheless informed them of his conversations prior to imposing sentence and gave appellant an opportunity to state his case for recusal. *Cf. Belton, supra*, 581 A.2d at 1214 (concluding that because court did not make clear that it did not consider *ex parte* communication in determining defendant's sentence until more than two months after sentencing, his "'impartiality might reasonably be questioned,' in violation of Canon 3(C)(1)").

**20.** Under *Liljeberg, supra* note 19, a different harmless error analysis applies where there is an appearance of partiality, in violation of Canon 3(C)(1). *See, e.g., Foster, supra* note 12, 615 A.2d at 219; *In re W.T.L., supra* note 13, 656 A.2d at 1129–30. However, in *In re W.T.L.*, we nevertheless considered the prejudice under both standards but noted that we did not intend to suggest that the violation of Canon 3(A)(4) indicated that the trial judge was intemperate or biased. *Id.* at 1130 n. 9. Even applying the more rigorous *Liljeberg* analysis to this case, we conclude there was no prejudice requiring reversal.

Under the *Liljeberg* analysis, we do not limit ourselves to actual prejudice, but consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases and the risk of undermining the public's confidence in the judicial process." *Liljeberg, supra* note 19, 486 U.S. at 864, 108 S.Ct. 2194. First, with respect to the risk to the parties in this case, as far as the government is concerned, if the judge is recused as a result of the post-trial conversation with the jurors, "'only a resentencing, not a retrial, is involved,'" *Foster, supra* note 12, 615 A.2d at 220 (quoting *Belton, supra*, 581 A.2d at 1215). As regards appellant, we believe that the risk of injustice to him also was minimal, given that he had the opportunity to argue mitigating circumstances before the court announced the sentence, and more significantly, in view of Judge Dixon's adamant statement that the *ex parte* information did "not affect[] [his] decision making." Second, the potential for injustice in other cases is small, in view of our prior warnings against *ex parte* communications in the context of sentencing and our recommendation in this opinion for trial judges to hold these meetings on the record and in the presence of counsel. *Cf. Foster, supra* note 12, 615 A.2d at 221; *In re W.T.L., supra* note 13, 656 A.2d. at 1130. Finally, the risk of undermining public confidence in the circumstances of this case must take into account the trial judge's good faith reason for conducting the meeting with jurors, one which was actually intended to *improve* public confidence in the judicial system, by seeking out ways to improve the jury experience, and the fact that there is no evidence of any bias on the part of the trial judge. *See In re W.T.L., supra* note 13, 656 A.2d at 1130.

ly stated that the jurors' disclosures did not form part of his sentencing deliberations, and his comments at sentencing confirm that the sentence imposed was based on the judge's own conceptions of what he regarded as "an unfortunate, cold blooded killing." *See Sloan, supra* note 19, 527 A.2d at 1287 (evident that court did not consider *ex parte* communication between juror and law clerk when judge reiterated that contact made "absolutely no difference whatsoever to the sentence I am probably going to impose" after defense counsel challenged communication); *cf. Belton, supra,* 581 A.2d at 1215 (no actual impropriety found under Canon 3(A)(4) even though judge did not make clear that he did not "consider" information about defendant obtained *ex parte* until over two months after sentencing).

### IV.

Thus, for the foregoing reasons, we affirm Harris' convictions.

*Affirmed.*